791 A.2d 270 (2002)
348 N.J. Super. 53
LAKE LOOKOVER PROPERTY OWNER'S ASSOCIATION, Plaintiff-Respondent,
v.
Bob T. OLSEN, Donald D. Davis, Janet L. Davis, Frank A. Cangelosi, Patricia Cangelosi, Thierry Murad, Jean-Philippe Murad, Catherine Murad, Stephen R. Brownlee, Carmella M. Brownlee, Rafael Colon, Iuseppina Rosetta, John Buonanno, Vincent J. Roselli, Iii, Nina M. Roselli, Carl Leuze, Maria Leuze, Ken Graber, Richard Vaillant, Joan Vaillant, George J. Stephens, Jr., Carmen E. Emery, Mark & Brenda Arnowitz, Philip Thomas Castronova, Kenneth L. Ziegelbauer, Jay J. Cahill, Lynne Cahill and Scott K. Cahill, Defendants-Appellants.
Superior Court of New Jersey, Appellate Division.
Argued October 16, 2001.
Decided February 14, 2002.
*271 Kenneth F. D'Amato, Morristown, argued the cause for appellants (Donald A. Rosenfelt, attorney; Mr. D'Amato, of counsel and on the brief).
Lawrence G. Tosi argued the cause for respondent (Warren, Tosi & Semeraro, attorneys; Mr. Tosi, of counsel and on the brief).
Before Judges WEFING, LESEMANN and PARRILLO.
The opinion of the court was delivered by LESEMANN, J.A.D.
Defendants, the owners of property surrounding an artificially constructed lake known as Lake Lookover, appeal from an order of the Passaic County Chancery Division which determined that defendants and other similarly situated property owners are responsible for the cost of repairing and reconstructing a dam on the lake. Defendants own approximately thirty-four of the 100 lots which were created at the time the developers of the land also created Lake Lookover by constructing the dam in question. The chain of deeds from the original developer to the present ownersapproximately 100 in allincludes the grant of easement rights to use the lake.[1] The trial court held that the holders of the easements bore responsibility for required maintenance and reconstruction of the dam, and for that purpose were required to comply with an assessment fixed by the plaintiff, Lake Lookover Property Owners Association (the Association), the present owner of the land encompassing the lake and its beaches, as well as the dam and some other common facilities.
Defendants challenge the authority of the Association to levy such assessments and also maintain that they may abandon their easement rights and thus be exonerated from any obligation to contribute to the repair or maintenance of the dam. We are satisfied, however, that under all of the facts in this matter, including the judicial proceedings which predate the present complaint, the Association was and is empowered to levy such assessments; that the trial court was correct in concluding that the holders of the easements are responsible for those costs; and that they cannot avoid that obligation by a purported abandonment of their easement rights. Accordingly, we affirm the decision of the Chancery Division, substantially for the reasons set out by Judge Susan L. Reisner in her written opinion dated June 22, 2000, together with the additional reasons set out below.
Lake Lookover came into existence in the 1920s when two developers, Alfred Hansen and Elias Lee, created the lake by damming a water course known as Longhouse Brook. Either before or soon after that construction, the property was apparently owned by a corporation, and thereafter it became held by a partnership known as Lake Lookover Development Company (the Development Company). The development started by Hansen and Lee included a division of property surrounding the lake into something over 100 home sites, and conveyances of those individual *272 plots included the easement rights summarized above.[2]
Beginning in or around 1980, the New Jersey Department of Environmental Protection (DEP) issued repeated directives to the Development Company and the Association, aimed at effecting repair and reconstruction of the dam, which the DEP said was unsafe. When there was no compliance with those directives, the DEP instituted suit in April 1994, against both the Development Company and the Association. In its complaint, the DEP referred to its earlier communications to both parties, contending that while the Development Company "as owner, had primary responsibility for the dam, ... that the Association through its unauthorized modifications to and exercise of control over the dam, was also a responsible party." In the complaint, the DEP described the Association as "an organization comprised of property owners who live adjacent to and possess lake rights to Lake Lookover." It also traced a pattern of what it claimed was the Association's exertion of "control over the dam by making repairs to the dam without a permit or approval from the DEP." The complaint also referred to various representations by the Association, dating from in or about 1990, that it intended to undertake necessary engineering studies and repairs to the dam in order to address the DEP's concerns.
Both the Development Company and the Association filed answers to the complaint. In addition, the Development Company filed a cross-claim against the Association, asserting that the Association is composed of holders of a "dominant easement" over the Development Company's property, that the Association "exercises exclusive control over the lake waters and its beaches and also controls access to the dam establishing the same and limits and restricts exclusive use of Lake Lookover to its members," and that the Association "even bars access to the beach area and lake" to the partners of the Development Company. It concluded that, as the holder of the dominant easement, the Association (and not the Development Company) is responsible for the maintenance and safety of the dam and all aspects of the lake, and it demanded that the Association "indemnify, and hold harmless" the Development Company from any claims of the DEP. In its brief in opposition to the DEP's request for summary relief, the Development Company cited the same principles and case authority as were relied on by the trial court here, in reaching its conclusion that the holders of the easements are primarily responsible for maintenance and repair of the dam: Island Improvement Assoc. v. Ford, 155 N.J.Super. 571, 383 A.2d 133 (App.Div.1978) and Ingling v. Public Serv. Elec. & Gas Co., 10 N.J.Super. 1, 76 A.2d 76 (App.Div.1950). In that same brief, the Development Company identified its partners as Leo Solomon "a retired attorney aged ninety-one years; his wife and two daughters." It also stated that, "The primary purpose of the partnership was to retain title to approximately four buildable lots for the family's use, which lots remain after a succession of conveyances by predecessors in title, as far back at 1926. The partnership also holds title to the land on which a dam is located and which forms the basis of this proceeding. The partnership is not presently engaged in any development."
Thereafter, Judge Amos Saunders of the Passaic County Chancery Division, entered an order dated June 27, 1994, dismissing the DEP action as against the Association and requiring the Development Company *273 to submit plans and details for proposed repairs to the dam within forty-five days. On October 25, 1994, after the court found that the Development Company had not complied with its June 27, 1994 order, the court directed that the four partners of the Development Company appear for an examination by the Attorney General to determine "the personal assets of each and their ability to comply with" the earlier order respecting plans and repairs for the dam. It also set a return date to determine the partners' ability to comply with those obligations. On March 16, 1995, still another order was entered, this one determining that the Development Company and its partners (who had not complied with the directive to appear for examination) "have the ability to comply" with the court's earlier orders, and directing that a bank account of approximately $120,000 belonging to the Development Company be posted "as security for the engineering plans and repairs to the dam." That account was "frozen," with a directive that the funds could not be transferred without prior approval of the court. The order further provided that if the Development Company and the Association could not reach an agreement by April 3, 1995, concerning funding of the engineering plans and reports, the proceeds of the bank account could be used for those purposes.
At least as early as March 2, 1995and probably earlier than thatthe parties undertook discussions among themselves and with the court concerning possible resolution of the dispute. In a letter to Judge Saunders dated March 2, 1995, counsel for the Association referred to preliminary attempts to estimate the cost of repairs to the dam. The letter noted that, "If the repair costs were learned to be totally beyond the reasonable reach of the homeowners, we would all need to reconsider the matter. But if the repair costs were manageable for the homeowners, we could establish a time frame and other mechanisms for undertaking the repairs." The letter went on to note that the Association "would initially undertake the role of a management organization on behalf of the homeowners," and it added:
Your Honor indicated that the Association's efforts to do so would be favored by the Court to the extent that the Association could bring consolidated summary proceedings or other expedited procedure before the court for collection of assessments under the Island Improvement doctrine. The Association's board is gratified to hear of this opportunity.
The letter then noted the proposal for the Development Company to convey the "lake bed and related lands" to the Association, with the Association empowered "to receive dues and assessments and preclude, to the extent possible, use of the lake by those failing to contribute to its maintenance and management." Counsel concluded that, "It would appear that the board will be able to obtain membership approval for such an agreement."
Throughout 1995 and 1996, and continuing into 1997, there were ongoing discussions and correspondence among the parties and with the court, all aimed at resolving the impasse concerning repairs to the dam. In an effort to relieve pressure on the dam and alleviate the DEP's concern as to the safety of the dam, the court, on July 16, 1997, and again on August 8, 1997, entered orders directing that the water level of the lake be reduced by three feet and the repairs and rebuilding of the dam commence as soon as possible. The Association responded by asking the court to reconsider its directive for lowering the water level, pointing out that such an action had been taken on a prior occasion with near disastrous results: a number of homes found *274 their wells inoperable, and the local fire department claimed the lower water level constituted a fire hazard. Eventually, in November 1997, the court stayed its directive.
Finally on February 5, 1998, the matter was settled by a seventeen page "Agreement and Consent Order of Settlement" executed by the DEP, the Development Company and the Association, and approved by Judge Saunders. It provided for the Development Company to convey the lake and beach property to the Association. It noted that the Association had already collected approximately $56,000 which it was holding in escrow, and it provided that the $56,000 should be available for use in effecting repairs of the dam. It also said that a $10,000 fine levied on the Development Company would be available for that purpose, but it provided for reimbursement to the Development Company of other funds it had expended in connection with the anticipated repairs and plans. It further provided that the repairs were to be undertaken in two phases; phase one to commence on or about April 1, 1998, and be completed by June 1, 1998; and phase two to begin one year later, on April 1, 1999, and be completed by June 1, 1999.
The settlement agreement had a provision entitled "Sharing of Costs and Fees" which said, in essence, that the costs of the project would be "borne on a pro rata basis" by all the Lake Lookover property owners who had "lake rights." It also said that, "The Association shall have the right and responsibility to bill each benefitted property owner on a monthly, quarterly or other regular schedule for all such fees and costs, and the failure by any such property owner to make timely payment in accordance therewith shall constitute good cause for the Association to notify the court of such failure, and such failure may constitute a contempt of court or occasion any other remedy as the court may deem fit in its discretion."
In addition, the agreement contained a "Section Seven" entitled "Association's Ability" which, in pertinent part, read as follows:
The parties recognize and agree that it is materially contemplated herein that the Association shall be supported by [the Development Company] and the Court in consideration of the obligations to be undertaken by the Association benefitting all property owners, with rights in and to Lake Lookover. For purposes of construing this provision, it is specifically understood and agreed that the Association's financial ability to perform as provided herein is dependent upon a fair and reasonable sharing of financial obligation among such property owners, ... at least as to the Lake Lookover dam, and reimbursement of [the Development Company], the conservation and preservation of its waters and the quality thereof.... The Association is responsible to collect funds to fulfill its obligations and responsibilities under this Consent Order and the Safe Dam Act.
Section Eight, entitled "Notice to Affected Property Owners," directed the Association to notify all property owners in Lake Lookover of the entry of the agreement and consent judgment and to provide each with a copy thereof, including "a form of waiver by which said property owners would waive appearance before this court and by which such property owners would consent to payment of a pro rata share of the above described expenses." The agreement further provided that the notice "shall advise such property owners that failure to consent shall make such property owners subject to an Order to Show Cause or other expedited remedy hereby *275 afforded the Association to achieve the intent and purpose of this agreement." Finally, the agreement provided for the withdrawal of pending appeals to this court by the Development Company and the Association respecting earlier orders by the Chancery Division and also provided for recording the Agreement in the Office of the County Clerk.
Attached to the agreement was an addition signed by Judge Saunders, reading as follows:
The within agreement having come before the Court, and it appearing that its terms will best serve the public interest and the respective interests of the parties, and it further appearing that the subject of this agreement and the costs and/fees connected therewith affect and obligate third parties who are presently not before the Court, and other good cause appearing, it is
ORDERED as follows:
1. This agreement shall bind and obligate the parties as described herein above.
2. The parties are granted leave to proceed as against appropriate third parties to achieve the sharing of costs as contemplated herein and otherwise on the strength of this order.
It is also important to note that, at least from the time of the DEP complaint in 1994, the Association made constant attempts to advise Lake Lookover property owners of the status of the matter and its seriousness. The appendix presented on this appeal contains several notices and other mailings directed to the property owners, pointing to the threat posed to the continued existence of the dam and the lake and thus to the community itself, seeking participation by all property owners in addressing the problem, and also soliciting financial contributions to provide the needed repairs to the dam. There were at least four such communications in 1994. In January 1995, there was a notice of a meeting of "all property owners (not just Association members)" to be held on January 26, 1995, to include an appearance by the Association's attorney who was to "explain the legalities of our recent court actions with" the Development Company and the DEP. That notice concluded with a plea that "this is your opportunity to gain knowledge and insight concerning our involvement as property owners and to understand what this is all about." The appendix also includes correspondence with the Association's attorney, requesting that he be prepared to address specified questions at the meeting referred to, including questions relating to the power and status of the Association to act respecting the dam. A letter in 1995, from the then president of the Association, also advised that the Association meeting attended by the attorney was recorded on tape and the tape could be made available to anyone who had been unable to attend the meeting. Similar letters concerning the status of the matter were dated May 8, 1995, August 13, 1995, September 2, 1995, and there was an undated letter in the Spring of 1996. There were also several communications concerning Judge Saunders's order (later stayed) directing a lowering of the lake's water level.
One letter, apparently mailed in early September 1997, refers to a meeting of the "Lake Lookover property owners" on September 4, 1997, at which the Association's attorney spoke to the property owners. The letter then notes that,
As a result of that meeting the property owners (not the association) unanimously voted to implement an assessment program to fund the difference between what the DEP has of [the Development Company's] monies and what is necessary to complete the repairs. The immediate *276 goal is to raise $38,000 by September 15th to demonstrate to the DEP our ability to raise the needed $116,000 by Feb. 1st so construction can start in April. A payment schedule was voted on and is as follows:
$500 due September 15th for each property owned.
$500 due November 15th for each property owned.
$500 due February 1st for each property owned.
As there are no monies available to us thru loans, this is our only recourse to attempt to have the DEP not destroy the lake. We have asked the DEP to delay this destructive measure [lowering of the water level] until the property owners have time to respond.
It was felt by all present that every effort must be made to SAVE THE LAKE. The very fabric of our community is deeply tied to existence of the lake. The deeded rights we all have legally obligates every property owner to pay their fare [sic] share.
A tape was made of the meeting and is available to anyone interested.
There are also numerous other letters, all in the same vein, and all directed to the Lake Lookover property owners throughout the period.
The settlement noted above was dated February 5, 1998, and was approved by the court on March 11, 1998. Even before the court had signed it, the Association had advised all property owners of the substance of the agreement, and on June 22, 1998, its attorney sent a more detailed explanatory letter plus a copy of the actual settlement agreement to each property owner. The letter advised the owners of their obligation to pay their pro rata share of the assessment to be made to repair and rehabilitate the Lake Lookover dam.
Meetings of the property owners and the Association members were scheduled and held in August 1998. At a meeting on August 23, 1998, a bid for the phase one dam reconstruction was accepted by a vote of thirty-one in favor and two opposed. At the same time, the plan for phase two was also approved, by a vote of twenty-three to four. The meeting was open to all Lake Lookover home owners but only those who had contributed the requested assessment were permitted to vote on acceptance of the bids. In a certification submitted in the present matter, the President of the Association said that throughout the entire period from 1994 into 2000, all property owners were generally permitted and encouraged to vote on questions concerning the lake or the dam reconstruction, and that this vote on the acceptance of bids was the only issue on which "people who did not make any payments toward the dam repair were restricted from voting." She said that, the owners present at the meeting "decided that those who refused to contribute to the dam repair fund should not have a vote in acceptance of a contract bid because the paying home owners would have to carry the cost until the nonpaying home owners were compelled to pay."
The original estimated cost of phase one of the dam repair was $116,000. However, by April 14, 2000, $231,000 had been spent on phase one, and the estimated cost of phase two was additional $200,000. Thus, if distributed equally among the Lake Lookover homeowners, each homeowner would pay approximately $2,300 for the phase one costs, and an additional $2,200 for phase two.
On April 14, 2000, the Association filed the present suit. The complaint stated that the defendants had failed to pay the "apportioned cost of repair and maintenance" in accordance "with the consent *277 order" issued and approved by the court in 1998. An order to show cause was issued, the matter was argued before Judge Reisner[3] on May 12, 2000, and June 21, 2000, and the court issued its opinion on June 22, 2000. An order embodying the substance of that opinion was entered on August 31, 2000, and this appeal followed.
In its decision, the Chancery Division found that there were no material facts in dispute. It further found that the Association,
as the owner of [the lake], has the power to make assessments against the property owners who hold an easement for use of the lake, for the upkeep of the lake including repair of the dam.
The court concluded that given the emergent need to repair the dam, in the face of a lawsuit by the Department of Environmental Protection (DEP), the Association acted reasonably in taking bids for repair and giving the contract to the lowest bidder. The court also declared it would not revisit the issues resolved by the order signed by Judge Saunders on February 5, 1998. It said the defendants had full notice of that matter, they had not asked Judge Saunders to reconsider the imposing of obligations on them, nor had they appealed the 1998 order. The court found it inequitable for the defendants now, some two years later, to challenge the actions which the Association had taken in reliance on that order.
The court also held, on the basis of case law as well as the terms of the 1998 order, that the Associationas owner of the lake and beach propertyhad the authority to make assessments against the property owners to cover the costs of needed repairs to the dam. It found the governing principle of law to be that set out in Island Improvement Assoc. v. Ford, supra, 155 N.J.Super. 571, 383 A.2d 133 (App.Div. 1978), as well as similar cases in this state and elsewhere.
The court did find that the Association had erred in simply imposing an identical assessment against all properties without considering whether assessments for different properties should vary depending on such factors as the size of an individual property, its proximity to the lake, and whether it had been developed. It directed the Association to meet again and make that determination, by vote in which all property owners (not just Association members) would have a right to participate. The court also directed that all easement holders should have the right to vote and use the lake facilities, whether they had or had not paid all assessments made against them. Recalcitrant easement holders might be subject to suit to recover monies due, but they could not be deprived of their rights as easement holders. To facilitate future orderly handling of issues, if and when they arose, the court certified the action as a class action, naming all the defendant property owners as members of a defendant class.
We agree with the reasoning and the conclusions of the trial court. We see no need to restate and re-analyze those issues. Instead, we shall comment only on the issues stressed by defendants on appeal: the defendants' claimed right to surrender their easement rights and thereby avoid liability for contributions to the repair cost of the dam; and defendants' contentions that the Association amounts to little more than an unauthorized interloper in this matter, with no authority or rational basis to accept conveyance of the lake property from the Development Company, to contract for the repairs of the dam or to *278 assess the homeowners for the costs thereof.
First, it should be clear that an acceptance of the defendants' argument that, if they surrender their easement rights they need not contribute to the cost of repairing the dam, would essentially subvert the rule set out in Island Improvement, that, "With the benefit [of an easement] ought to come the burden, absent agreement to the contrary...." Island Improvement, supra, 155 N.J.Super. at 574, 383 A.2d 133. The argument that, notwithstanding that principle, one can avoid its impact by surrendering the easement right, has a deceptive simplicity. Some reflection, however, makes clear that the concept is not sound.
The fact is that the present easement holders or their predecessors in title have enjoyed the benefit of the Lake Lookover easement since its creation in the 1920s. It was in that time frame that the easement was granted and the dam created. The dam has undoubtedly suffered wear and tear over the ensuing years and, not surprisingly, after some eighty years it requires substantial rehabilitation.
A decision which would permit those who have enjoyed use of that easement to now avoid such payment, simply by an act of purported abandonment of the easement, would make little sense. The condoning of such action would subvert the equitable concept on which the rule of Island Improvement is based: that the burden should follow the benefit. Under such a rule, the ones who enjoyed the benefits would share none of the burdens.
We are not, of course, dealing with an "abandonment" which took place at or about the time the easement itself was created. That is, if an original grantee from the Development Company had forthwith and formally renounced the easement immediately upon receipt of a deed, one could conjure a rational argument which might sustain such relief. Under those circumstances, the Development Company, for example, might have demanded a return of its deed if it felt that such action by the grantee threatened the integrity of the entire lake community. Or, the Development Company might have demanded some other acknowledgment of an obligation to contribute to repairs; or, at least, it would have been apprised of the grantee's position and been given an opportunity to respond.
Here, there was no such notification by any grantee. So far as appears, for some eighty years, the holders of the easements enjoyed the rights and privileges attendant upon those easements. No one ever purported to surrender the easement right. Even when the DEP filed its 1994 suit demanding that the Development Company and/or the Association attend to the needed rehabilitation of the dam, there is no indication that any property owner purported to surrender their easement rights. Only after the Association had spent close to four years struggling with the Development Company and the DEP and attempting to protect and preserve the lake, did the defendants press their claim of a right to avoid repair obligations by surrendering their easements.
Defendants argue that the Restatement (Third) of Property: Servitudes § 4.13 supports their position. However, the trial court rejected that argument and we agree.
Section 4.13 of the Restatement sets out the general rule that, unless the terms of the easement provides otherwise, "The beneficiary of an easement ... has a duty to the holder of the servient estate to repair and maintain the portions of the servient estate and the improvements used in the enjoyment of the servitude...." That is the same general rule *279 that applies in this state under Island Improvement. Further, paragraph (4) of section 4.13 expressly states that, "The holders of separate easements ... who use the same improvements or portion of the servient estate in the enjoyment of their servitudes have a duty to each other to contribute to the reasonable costs of repair and maintenance of the improvements or portion of the servient estate." That language seems squarely applicable to this case, where the several property owners hold "separate easements" in the same servient estate (Lake Lookover) and thus have a duty to each other to contribute to the cost of repairs and maintenance that are required to preserve that lake.
Defendants, however, rely on comment b to section 4.13 which, (as part of a much longer discussion) contains what amounts to little more than a passing observation that the holder of an easement "is free to abandon the servitude" and adds that, "any duty that arises generally ceases on abandonment ..." However, in quoting that provision, defendants ignore the remaining portion of the quoted paragraph, as well as other sections of the Restatement which bear on the duty in question. Thus, after the statement quoted by defendants, comment b to section 4.13 states that,
Once the easement owner has started making use of the easement, there is a duty to make such repairs or do such maintenance as may be necessary to avoid unreasonable interference with the servient estate.... If the servient estate is being used by the servitude owner in common either with holders of other similar servitudes or with the owner of the servient estate, the owner of the servitude does not have an affirmative duty to make repairs, but does have a duty to contribute to the reasonable costs of repairs or maintenance undertaken by others.
That provision, therefore, seems consistent with that quoted above: holders of separate easements have a duty to each other to contribute to maintain a common servient estate.
To permit those in a position such as defendants to avoid their maintenance obligation by some purported abandonment or surrender of the easement rights which they or their predecessors have enjoyed for so many years, would quite obviously represent a default in the obligations of those easement holders to their fellow easement holders. It would render it difficult, if not impossible, for anyone to enjoy the benefit of the easement, or to enjoy the lake itself, which might well be destroyed if the DEP followed through with its stated intent to remove the dam if the required repairs are not made. We do not believe the Restatement supports that position or, if it does, we decline to adopt it.
We also find no merit in defendants' claim that the Association in some way adopted an improper role and assumed duties, rights and obligations that it had no right to assume. Although defendants paint the Association as nothing more than a beach social club during most of its existence, the picture that emerges from this litigation is quite different. Although title to the lake and other common property remained in the Development Company until 1998, the fact is that the Association generally supervised use of the lake and attended to routine repairs and other matters that required attention throughout the life of the Lake Lookover community. Indeed, in their present brief, defendants argue that the Association's exercise of control over the lake, dating back at least to 1975, was frequently arbitrary, and that the Association exercised powers to limit and govern access to the lake and the beach for many years. We note too *280 that, in its presentation to the court, the Development Company originally asserted that the Association, not the Development Company, should be responsible for dam repairs and maintenance because over many years, the Association had been the de facto operator of the entire lake community. And, of course, the DEP apparently also had such a view of the Association's activities and status since it joined the Association as a defendant in its complaint.
In its notices and letters to easement holders, and in its certifications submitted initially before Judge Saunders and thereafter in this litigation, the Association has consistently maintained that the lake is the center of the Lake Lookover community. The community was created by the original developers of the lake and builders of the dam. The homes were built on the lots laid out by the original developers of the lake and the surrounding area are there because of the lake. In 1997, when Judge Saunders initially ordered a lowering of the water level in order to reduce pressure on the dam, it was the Association that led the effort to induce Judge Saunders to stay that orderwhich he finally did. It was the Association that pointed out the dire consequences of such action in the past, and the likelihood that there would be similar adverse effects in the future. So far as appears, none of the defendants disagreed with the Association's taking the lead role in that earlier litigation or in the negotiations with the Development Company and the DEP.
As described above, the Association made constant efforts to apprise the easement holders of the status of the litigation before Judge Saunders, and what they saw as a threat to the very existence of Lake Lookover and the well-being of the community. There was no impropriety in the Association assuming that role and taking those actions. As Judge Reisner noted in her opinion, the Association did not perform perfectly in conducting its meetings and holding its votes, but its mistakes were subject to correction and, with the guidance and supervision of the court, there is no reason to believe they will be repeated in the future.
We agree with the trial court's conclusion that there is no reason to overturn any of the good faith actions taken by the Association. As the court noted, the defendants never asked Judge Saunders to reconsider or vacate the order he entered in 1998, nor did they appeal that order. They do not claim that the repairs demanded by the DEP were unnecessary or excessive. Aside from unsubstantiated statements in their brief, that the repairs could have been effected in a less costly manner, they do not challenge the bid prices for the work to be done or the acceptance of the bids. Only long after the Association has wrestled through this complex, difficult proceeding designed to save Lake Lookover and the Lake Lookover community do defendants now object to the Association having undertaken the efforts they were aware of over the last several years. To set aside all of those actions, and require all to start anew, could only produce anarchy as respects any attempt to accomplish repairs to the Lake Lookover dam and preserve the dam, the lake and the community itself.
The order under appeal is affirmed.
NOTES
[1] The easements appeared at various stages of the chains of title, sometimes in deeds from the original developer and sometimes via mesne conveyances. They were variously phrased and formulated. However, it is generally agreed that all the properties received, in one form or another, the benefits of an easement entitling the owners to use Lake Lookover.
[2] Approximately fourteen plots have never been sold and at the time these proceedings arose, were still held by the Development Company.
[3] Judge Saunders had since retired.