**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3224-15T2

LAKE GRINNELL ASSOCIATION,

    Plaintiff-Respondent,

v.

LAWRENCE POST, a/k/a LARRY
POST and KAREN YORK,

    Defendant-Appellants.

_____

        Submitted July 11, 2017 — Decided October 26, 2017

        Before Judges Nugent and Accurso.

        On appeal from Superior Court of New Jersey,
        Law Division, Sussex County, Docket No. DC-
        002498-15.

        Carter, Van Rensselaer & Caldwell, PC,
        attorneys for appellants (William J. Caldwell,
        on the brief).

        Fein, Such, Kahn & Shepard, PC, attorneys for
        respondent (Alvin L. Darby, on the brief).

PER CURIAM

    Defendants Lawrence Post and Karen York own a lakefront

residence and enjoy an appurtenant easement for use of the lake,

Lake Grinnell, in Sussex County. They appeal from a Special Civil

Part order for summary judgment requiring them to pay $2,158.61 as their pro rata share of maintenance fees for the lake and a dam. Because genuine issues of material fact should have precluded summary judgment, we vacate the order and remand for further proceedings.

Plaintiff Lake Grinnell Association (the Association) commenced this collection action by filing a single-page complaint in the Special Civil Part. The collection complaint's first three counts state:

> FIRST COUNT: There is due from defendant(s) the sum of $2,050.83, for easement maintenance and/or dues for Lake Grinnell Association. Payment has been demanded and has not been made.
>
> SECOND COUNT: Plaintiff(s) sue(s) defendant(s) for easement maintenance and/or dues for Lake Grinnell Association upon the promise by defendant(s) to pay the agreed amount. Payment has been demanded and has not been made.
>
> THIRD COUNT: Plaintiff(s) sue(s) defendant(s) easement (sic) maintenance and/or dues for Lake Grinnell Association upon the promise of defendant(s) to pay a reasonable price for the same. Payment has been demanded and has not been paid.

The Association demanded judgment in the amount of $2,050.83 plus interest, fees, and costs.

The complaint was false in several respects. As the summary judgment motion would disclose, the Association was not seeking

dues from defendants. Contrary to the complaint's second and third counts, defendants had never made a promise to pay dues, maintenance fees, or "a reasonable price for same." In fact, there had been a longstanding dispute between the Association and defendants and their predecessors about defendants' right to enjoy the appurtenant easement and their obligations for doing so. Thus, underlying what appeared to be a relatively small collection action was a claim for equitable relief requiring adjudication of the benefits and burdens of dominant and servient estates.

Four months after filing its complaint, the Association filed a summary judgment motion. The Association supported the motion with a certification from its vice-president. The certification and attachments establish that the Association was formed as a non-profit corporation in 1946. According to the certificate of incorporation, seven individuals formed the Association for the following purposes:

> 1. To encourage the development and growth of Lake Grinnell . . . ; to coordinate and unify the interest and influence of the owners of properties at said Lake Grinnell and the residents thereof for a more effectual protection and promotion thereof; to formulate and carry into effect all projects for the improvement of the health, general welfare, and the cultural and recreational requirements of the residents and users of Lake Grinnell; to aid in the development of any legitimate enterprise that will tend to increase the facilities and advantages of Lake Grinnell,

 A-3224-15T2

> and to promote general good order and government.
>
> 2. To purchase or otherwise acquire and construct and to hold, maintain, buy, levy, convey, invest, use, enjoy and distribute both real and personal property or any interest therein, and to borrow moneys for said purposes for the uses and benefit of the members of this organization and for the promotion of the objects of this corporation.

Seventeen years later, in 1963, forty-one association members with properties around the lake contributed funds to the Association. The Association used the funds to acquire title to approximately thirty-six acres of lake bottom from the Lehigh and Hudson River Railroad Company. The lake is approximately one mile long and consists of approximately forty-five acres. The deed conveying title to the lake bottom acreage was expressly "[subject] to the rights of others to use the waters of Lake Grinnell." According to the vice-president's certification, the homeowners who contributed funds to purchase the lake bottom property are now designated as "owner-members" under the Association's by-laws.

The Association's vice-president further averred that since 1963, the Association has assumed responsibility for weed control and water quality maintenance. Additionally, the Association has taken on the responsibility of paying real estate taxes, liability insurance premiums, and fees to "legal counsel to protect [the homeowners'] property interests and quality of life." As of the

date the vice-president filed his certification, weed control was the largest annual expense.

The vice-president explained that the Association's Treasurer's Report for the previous year is presented at an annual July meeting. The Association's fiscal year ends June 30. The "homeowners" vote to approve the report.[1] Non-members of the Association, such as defendants, are then assessed a proportionate share of those items in the Treasurer's Report representing the previous year's maintenance of the lake and dam.

The vice-president attached to his certification the treasurer's reports for the fiscal years beginning with 2009-2010 and ending with 2013-2014. The vice-president also attached to his certification the "Book Account" for each defendant. The Book Account was printed on the Association's letterhead, included the names and addresses of defendants as "tenants in common," and contained the following under the designation, "Book Account":

```
RE:   29 Lake Grinnell Lane
2010 lake maintenance              195.95
2010 dam assessment                400.00
2011 lake maintenance              199.82
2012 lake maintenance              215.67
2013 lake maintenance              232.49
2013 maintenance assessment        500.00
2014 lake maintenance              306.90
                                $2,050.83
```

---

[1] The certification is not clear as to whether non-members are permitted to vote or challenge the report.

The vice-president explained in his certification that in 2010 the Association levied a $400 dam assessment "against all [fifty] homeowners, for expenses incurred and to be incurred in connection with inspections, reports, surveys and repairs required by the New Jersey Department of Environmental Protection, Dam Safety Section." The vice-president further certified that "[a]ny unused portion of the $400 [would] be used for future dam expenses." According to the vice-president's certification, in 2013, the Association assessed a $500 maintenance fee against all fifty homeowners as the result of the Association having incurred $25,000 in legal fees "in 2012-2014 to protect the water quality of the lake from a threatened quarry operation on the adjoining property. This was a necessary expense to maintain the excellent quality of water in Lake Grinnell. Refer to Treasurers (sic) Reports showing the disbursements." The reports referenced in the certification have a line item entitled "Legal" with no other explanation.

The vice-president did not explain when the alleged Book Accounts were prepared or when the Association notified defendants of the assessments contained in the so-called Book Accounts. The vice-president's certification contained the conclusory assertion that defendants' balances from the Book Accounts were due and

owing, and they had adamantly refused to pay any maintenance or dam expenses.[2]

Defendants disputed much of the vice-president's certification and filed a certification from Lawrence Post in opposition to the Association's summary judgment motion. He averred his parents purchased defendants' lakefront property in 1959, four years before the Association purchased the lake bottom land. Thereafter, the Association attempted to exclude non-members from using the lake. This resulted in a lawsuit in which the court dismissed the Association's complaint and issued a judgment in favor of defendants' predecessor in title. The court determined that defendants and other members not part of the Association had "acquired from their respective grantors an easement appurtenant to the lands described in [the] Deeds in the waters of Lake Grinnell."[3]

Defendant Post next certified that in 2001, the New Jersey Department of Environmental Protection notified the municipality and the Association that a dam required periodic inspection.

---

[2]  This averment directly contradicts the assertion in counts two and three of the complaint that defendants promised to pay either the assessments or the reasonable value of the services the Association performed.

[3]  A copy of the court's oral decision and implementing order are included in the record on appeal.

According to Post, "[t]his [need for inspection] occurred because 195 feet of the shoreline is [the municipality's road] and the road has a spillway beneath the pavement, installed when the road was improved to its present state in 1900 to release water during 10, 50, and 100 year storm events." Post claimed the Association disputed liability and responsibility for the dam for many years, until 2015, when the municipality and the Association signed a shared responsibility agreement. Post asserts the Association entered the agreement based on the regulatory definition of a dam's "owner" or "operator," and by virtue of the Association's unauthorized use of the dam for various purposes.

Post further asserted that in July 2006, the Association "began a financial offensive against [defendants] . . . when it demanded seven years of delinquent 'dues' and 'maintenance and repair costs.'" Further, Post claims that notwithstanding the judgment entered against the Association in the earlier lawsuit, the Association has threatened defendants' water rights in Lake Grinnell. Post asserted defendants had responded to every Association demand for payment of dues and maintenance costs by reiterating they were not association members, wanted nothing to do with the Association's initiatives, and could not be held responsible by the Association for debts they did not incur,

particularly those related to the improper and unauthorized use of what defendants considered the municipal dam and spillway.

In 2015, in a letter from the Association's counsel to defendants, the Association, through counsel, finally conceded defendants "[were] not . . . member[s] of the Association and . . . that under those circumstances, [defendants were] not obligated to pay [Association] dues." The same letter asserted, notwithstanding defendants' non-membership in the Association, defendants were legally "obligated to contribute to the maintenance and repair of [their] easement." Defendants disputed legal responsibility for maintenance fees, particularly fees involving the dam.

Based on these moving and opposing certifications, and the decision and order filed in the Association's previous lawsuit, the judge sitting in the Special Civil Part granted summary judgment in favor of the Association. The judge concluded that while defendants had no contractual obligation to contribute toward maintenance of the easement, because they were owners of the easement's dominant estate, they had, along with the right to the use of the easement, the legal duty to contribute toward its maintenance.

The judge also determined the Association, as owner of the majority of the land beneath the lake, had authority to make

assessments against non-member property owners to cover the costs of needed repairs to the dam. With respect to the dam, the judge concluded that since defendants began enjoying the benefit of their easement, "the lake and dam have undoubtedly suffered wear and tear over the years." Lastly, the judge determined the fees assessed by the Association were reasonable.

Defendants also raised as defenses collateral estoppel, the entire controversy doctrine, and res judicata. The judge rejected these defenses and filed an implementing order. This appeal followed.

A party is entitled to summary judgment when, viewed in the light most favorable to the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2; accord Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 528-29 (1995). Our review of an order granting summary judgment is de novo. Jones v. Morey's Pier, Inc., 230 N.J. 142, 153 (2017); Bhagat v. Bhagat, 217 N.J. 22, 38 (2014) ("An appellate court reviews an order granting summary judgment in accordance with the same standard as the motion judge.").

Here, the motion record did not show there was no genuine issue as to any material fact challenged. Moreover, the parties had not developed an adequate record on which the court could adjudicate the fact-sensitive equitable considerations underlying what appeared from the complaint to be a relatively small collection action. To the contrary, in order to ascertain the Association's relatively minor legal claim, the court was required to adjudicate the parties' rights and obligations concerning an appurtenant equitable easement. Such an adjudication has long-term implications, including the possible future liability of defendants to contribute to the expenses of maintenance or perhaps replacement of an existing dam.[4]

Indisputably, defendants have an easement appurtenant to their property to use the waters of Lake Grinnell for boating, fishing, bathing, and other recreational purposes. "An easement creates a nonpossessory right to enter and use land in the possession of another and obligates the possessor not to interfere with the uses authorized by the easement." Restatement (Third) of Prop.: Servitudes § 1.2(1) (2000). The term "'[a]ppurtenant'

_____

[4]   In view of the significant underlying equitable issues, we question whether the Special Civil Part should have decided this matter and not transferred the case to the Chancery Division. Civil actions cognizable in the Special Civil Part, with exceptions not relevant here, are those "seeking legal relief when the amount in controversy does not exceed $15,000." R. 6:1-2(a)(1).

A-3224-15T2

means that the rights or obligations of a servitude are tied to ownership or occupancy of a particular unit or parcel of land." Id. § 1.5(1). "[T]he interest in land with which [an easement] runs may be called the . . . 'dominant' estate." Id. §1.1(1)(b). The interest in land subject to an easement "may be called the 'burdened' or 'servient' estate." Id., § 1.1(1)(c).

In Island Improvement Association v. Ford, 155 N.J. Super. 571, 574 (App. Div. 1978), a case concerning maintenance of private roads in a privately developed residential area, a panel of this court, "[c]onviced that with the benefit ought to come the burden," held that "absent agreement to the contrary, . . . the obligation to maintain [an easement] devolves upon the dominant tenant." (Citing 2 Thompson, Real Property, § 428 at 709 (1961)). The panel emphasized "[t]his is certainly the rule where the easement is solely for the benefit of the dominant estate." Id. at 574-75. In so holding, the panel explained, "[i]n our judgment there are compelling equitable reasons to apply the rule to the situation before us even though there may well be incidental use of these roads by others than the individual landowners." Id. at 575 (emphasis added).

In the case before us, we can glean from the record no evidence from which one can conclude there are "compelling equitable reasons" to require defendants to contribute to

maintenance of the dam. That is not to say such reasons either do or do not exist. The summary judgment record contains insufficient information to support either conclusion.

The Association relies upon <u>Lake Lookover Property Owner's Association v. Olsen</u>, 348 <u>N.J. Super.</u> 53 (App. Div. 2002). In that case, the owners of property surrounding an artificially constructed lake appealed from an order requiring similarly situated property owners to contribute to the cost of repairing and reconstructing a dam on the lake. <u>Id.</u> at 54. The defendants' lakeside lots were created when the developers created the lake by constructing the dam in question. <u>Id.</u> at 54-55. The court held "the several property owners hold 'separate easements' in the same servient estate (Lake Lookover) and thus have a duty to each other to contribute to the cost of repairs and maintenance that are required to preserve that lake." <u>Id.</u> at 67.

Additionally, in rejecting the defendant's argument that the Lake Lookover Property Association had adopted an improper role and assumed duties it had no right to assume with respect to operation of the dam, the court noted the original development company as well as the Department of Environmental Protection (DEP) had deemed the property association the <u>de</u> <u>facto</u> operator of the entire lake community. <u>Id.</u> at 69. The court noted the characterization of the property owner as a <u>de</u> <u>facto</u> operator of

the entire lake community was supported by the evidence adduced before the trial court, which established the association had "consistently maintained that the lake [was] the center of the . . . community." Ibid.

> The community was created by the original developers of the lake and builders of the dam. The homes were built on the lots laid out by the original developers of the lake and the surrounding area are there because of the lake. In 1997, when the [court] initially ordered a lowering of the water level in order to reduce pressure on the dam, it was the Association that led the effort to induce [the court] to stay the order - which [it] finally did. It was the Association that pointed out the dire consequences of such action in the past, and the likelihood that there would be similar adverse effects in the future. So far as appears, none of the defendants disagree with the Association's taking the lead role in that earlier litigation or in the negotiations with the Development Company and the DEP.
>
> [Ibid.]

The case now before us has significant factual differences from the facts in Lake Lookover. According to the certifications in the present case, Lake Grinnell was not formed by a dam; it is a naturally occurring lake. The record contains scant evidence concerning the construction of the dam and its purpose, though defendants claim the municipality built the dam in conjunction with the improvement of a municipal road. In addition, here, unlike in Lake Lookover, the parties presented the trial court

14

with virtually no details about what role the Association played with respect to prior use of the dam; if, when, and why the Association operated the dam; and why the Association agreed to bear fifty-percent of the responsibility for the dam's maintenance during the DEP litigation. Perhaps most significantly, there is no evidence on the motion record about how the dam's operation contributes to defendants' enjoyment of the easement, unlike Lake Lookover, where without the dam there would be no lake.

Aside from the issues concerning the dam, the summary judgment record does not support the judge's finding that the maintenance fees the Association charged defendants were reasonable. For example, the Association's conclusory assertion that fees paid to an attorney regarding a neighboring use of property was necessary to maintain the quality of water in Lake Grinnell is not supported by any underlying facts or even any description of the nature of the role the attorney played.

To be clear, we are not suggesting defendants have no obligation to contribute a fair share to the maintenance of the appurtenant easement they enjoy. Nor should this opinion be construed as suggesting that defendants either do or do not have to contribute to the costs of maintaining the dam. We merely hold that on the scant summary judgment record there are inadequate

facts from which a court can analyze and resolve the equitable considerations underlying the parties' contentions.

For these reasons, we vacate the order for summary judgment and remand this matter, in the first instance, to the Chancery Division. There, the judge can conduct a preliminary conference, determine what discovery is needed to resolve the parties' claims, determine whether other parties should be added, and determine whether this action should remain in the Chancery Division.

The order of summary judgment is vacated. This matter is remanded to the Chancery Division for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3224-15T2