809 A.2d 178 (2002)
355 N.J. Super. 55
Peter POBLETTE and Elizabeth Poblette, his wife, Michael Cool and Merryl Cool, his wife, Ronald Riccio and Annette Riccio, his wife, Dominic Dellaventura and Eileen Dellaventura, his wife, and James T. Luttes, Plaintiffs-Respondents,
v.
TOWNE OF HISTORIC SMITHVILLE COMMUNITY ASSOCIATION, INC., A NEW JERSEY CORPORATION, AND ROSELAND MANAGEMENT CO., INC., Defendants-Appellants, and
Mid-Atlantic Corporation, a New Jersey Corporation, and Starebare Associates, L.P., James Cox, Domenick Collela, Sandi Grimmie, Phil Kraus, Anthony Coppola, and Bruce Schmilowitz, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued October 2, 2002.
Decided November 12, 2002.
*180 Davis S. Florig argued the cause for appellants (Florig and Dolich, attorneys; Michael Dolich and Mr. Florig, on the brief).
Walter T. Wolfe argued the cause for respondents (Owens & Wolf, attorneys; Joseph C. Weiss, of counsel and on the brief).
Before Judges KESTIN, FALL[1] and WEISSBARD.
*179 The opinion of the court was delivered by WEISSBARD, J.A.D.
Defendants, Towne of Historic Smithville Community Association, Inc. (the Association) and Roseland Management Co., Inc., (Roseland) appeal from a judgment in the amount of $327,000 plus prejudgment interest, in favor of plaintiffs Peter and Elizabeth Poblette, Michael and Merryl Cool, Ronald and Annette Riccio, Dominic and Eileen Dellaventura, and James T. Luttes (collectively plaintiffs). We affirm.
In 1981, the Historic Smithville Development Co. (developer), a New Jersey Partnership, filed a Declaration of Covenants, Conditions and Restrictions (Declaration) in anticipation of the construction of a planned unit development (Development) in Atlantic County, New Jersey. The developer created the Association as a nonprofit corporation to manage and maintain the Development in accordance with the provisions of the Declaration. Under the Declaration, each owner of property within the Development became a member of the Association and was subject to the Declaration and bylaws adopted by the Association.
The Declaration provided that the members were subject to certain easements held by the Association. For instance, Section 4.01(g) provided that each member's rights of enjoyment in and use *181 of the community facilities of the development is subject to
[a]n easement for the present and future installation and maintenance of electric service, master and/or cable TV service, telephone service, water (storm water and sanitary sewer), gas and drainage facilities and the necessary appurtenances to the same which easement shall run in favor of the [developer], Transferees, Community Association and the entity or entities owning or operating such facilities.
Similarly, Section 7.01(r) provided that in addition to the other covenants contained in the Declaration, "the use of Community Facilities and Limited Community Facilities and each Dwelling Unit, Lot or Parcel of the Town of Historic Smithville is subject to" the same easement set forth in Section 4.01(g), quoted above.
In 1987, the developer filed a public offering statement (POS) "pursuant to the requirements of The Planned Real Estate Development Full Disclosure Act (N.J.S.A. 45:22A-21 et seq.)" giving notice to purchasers of the availability of units in the Development known as "Towne of Historic Smithville." The POS disclosed that
[r]esidential dwelling units in the Development shall be offered under and subject to [the Declaration] which will be recorded against the property within the Development in the Office of the Recorder of Deeds in and for Atlantic County, New Jersey.
The Declaration sets forth provisions governing the use, ownership, maintenance and administration of all the property within the Development....
The Declaration further provides that, upon taking title to any dwelling unit or lot within the Development, the legal owner of such dwelling unit or lot shall automatically become a member of the Community Association. The operation of the Community Association will be governed by a set of By-Laws....
The Community Association will have the responsibility for the maintenance, governance and administration of those areas and improvements designated as community facilities (the "Community Facilities").... Such Community Facilities will be owned by the Community Association. In addition, the Community Association will have responsibilities for the maintenance of certain facilities in the Development designated as limited community facilities (the "[Limited] Community Facilities") which shall not be owned by the Community Association. Such Limited Community Facilities include, but are not limited to, various landscaped cul-de-sac islands located throughout the Development. These islands, along with certain streets, will be dedicated by the Developer to Galloway Township but will be maintained by the Community Association.
In August 1997, Atlantic County experienced a storm, described by one of the experts as being "of a magnitude greater than the 100-year storm." During a period shortly following the storm, plaintiffs, who owned homes in the Development, suffered substantial damage to their homes from flooding allegedly caused by the overflow of a detention basin on the Development that was to form part of the storm water drainage system. Significantly, the developer had gone bankrupt well before the flood had occurred.
About a year after the storm, plaintiffs filed a complaint naming as defendants the Association, Roseland and Mid-Atlantic Asset Management Company (Mid-Atlantic), the management companies retained by the Association to assist in maintaining the Development, and six individual members of the Association's Board of Directors. The complaint, which related to *182 the flood damage to plaintiffs' properties, raised claims against the Association and the Management Companies for breach of duty, eviction, trespass, and nuisance. In addition, plaintiffs claimed breach of fiduciary duty on the part of the individually-named members of the Association's Board of Directors. Thereafter, plaintiffs filed an amended complaint naming as an additional defendant Starebare Associates (Starebare), a real estate development investment company that owned the property on which the basin was located as of the time of the flood.
Plaintiffs filed a motion for partial summary judgment, seeking an order "adjudging that the [Association] was under a duty to maintain and repair the detention basin adjoining plaintiffs' properties ... as the holder of an easement granting exclusive control of said detention basin to [the Association]...." After a hearing, Judge Previti entered an order granting the requested relief.
More than six months later, the Association, Roseland, and the individually-named members of the Association's Board of Directors filed a motion for summary judgment. The motion was heard on May 11, 2001, at which time Starebare made its first appearance in the matter. Judge Previti, upon consideration of the motion and in light of other requests made by counsel for the respective parties during the motion proceedings, entered an order granting summary judgment in favor of Starebare as to all direct claims and cross claims against it, denying plaintiffs' application for costs and attorney's fees, dismissing the claim against the Board members for breach of fiduciary duty, and making the following factual determination pursuant to R. 4:5-8 "for the purpose of delimiting issues at trial":
a. Transition of the [Development] took place with respect to the storm water basin, which is the subject matter of this suit, and the [Association] had responsibility, under the filed Declarations and the Association By-laws, for the basin and this issue may not be re-litigated at trial;
b. [The Association], as the easement holder, was the "owner" and "operator" of the storm water basin as those terms are employed in the Atlantic County Land Development Standards and this issue may not be re-litigated at trial;
c. [The Association] had a duty by way of the easement created by the [Declaration] to inspect, as an element of its maintenance obligations, the storm water basin which is the subject of this litigation and this issue may not be re-litigated at trial;
d. De-silting and removal of leaves and debris of the storm water basin as an element of improper maintenance may not be re-litigated at trial because Plaintiffs' expert has found they were not a proximate cause of the flooding which damaged plaintiffs' homes, and,
e. The failure of the [Association] to inspect the storm water basin and discover and correct the lack of an outflow mechanism and/or the lack of adequate depth of the structure as the proximate cause of the flooding is preserved as an issue for determination at trial.
A four-day jury trial followed on the sole remaining issue of proximate causation. At the commencement of trial, plaintiffs, the Association and Roseland stipulated on the record to damages in the amount of $327,000 if the defendants were found liable. A jury verdict in favor of plaintiffs was returned, and judgment was thereafter entered awarding plaintiffs damages of $327,000, pursuant to the parties' stipulation, together with prejudgment interest of $65,959.93.
*183 Defendants argue on appeal that the motion judge erred in finding, as a matter of law, that the Association held an easement under which it had a duty to maintain the detention basin in question. The crux of this argument is that (1) no easement in favor of the Association existed under the relevant provisions of Sections 4 and 7 of the Declaration because the detention basin is neither a "Community Facility" nor a "Limited Community Facility" as those terms are defined, and (2) even if the basin did meet either definition, no easement was created because there was never a "transition" of the duty to maintain the detention basin from the developer to the Association. N.J.S.A. 45:22A-47. We conclude that neither argument has merit.
In granting plaintiffs' motion for partial summary judgment, the motion judge considered the "totality of the circumstances" and the "totality of the declaration" to discern the "obvious intent of the declarers of that declaration." The judge found that in drafting the Declaration the developer had considered "the water problems that may exist or may exist into the future and [had] provided for, when they transfer[ed] the property, a provision whereby there would be an easement granted for ... sanitaryor storm sewer ... and the drainage easement." He concluded that it was the clear intent of the developer that the detention basin was meant "for the benefit of all members" and that under the relevant language set forth in the Declaration the Association held an easement as to the detention basin. We agree.
Defendants claim that the detention basin in question is not subject to an easement held by the Association because it does not, by definition, fall into the category of common elements over which the Association has been granted an easement under the Declaration, namely community facilities and limited community facilities. Under the Declaration, Community Facilities "include open space, active and passive recreation areas ... and such other facilities as the [Association] may own or acquire or construct hereafter." Limited Community Facilities are "those facilities used and enjoyed by a member or members of the [Association] and maintained by the [Association] but not owned by the [Association]." As noted above, under Section 4.01(g) of the Declaration, these facilities are subject to "[a]n easement ... which runs in favor of the [developer], Transferees, [the] Association and the entity or entities owning or operating such facilities."
While defendants go to great lengths to explain why the detention basin in question is not a community or limited community facility, we conclude that whether or not the basin falls within these definitions is not dispositive in determining whether the Association held an easement to the basin in view of the broad language contained in Section 7.01 of the Declaration:
In addition to all of the covenants contained herein, the use of the Community Facilities and Limited Community Facilities and each Dwelling Unit, Lot or Parcel in the Towne of Historic Smithville is subject to the following:
....
(r) An easement for the present and future installation and maintenance of electric service, master and/or cable TV service, telephone service, water [storm water and sanitary sewer], gas and drainage facilities and the appurtenances necessary to the same, which easement shall run in favor of the [developer], Transferees, the [Association] and the entity or entities owning or operating such facilities.
*184 The clear import of this language is that the easement relating to the installation and maintenance of storm water, sanitary sewer, and drainage facilities is not circumscribed to cover only community and limited community facilities, but to all property within the development.
Defendants further argue that the easement to maintain the storm basin never attached to the Association because there had not been a formal "transition" of this responsibility from the developer to the Association. Specifically, defendants assert that absent such a formal transition and because it was a disputed issue of fact as to whether the detention basin had ever been completed, the Association had no responsibility to maintain the detention basin and the grant of partial summary judgment to plaintiffs was error.
Where the language purportedly granting an easement is ambiguous or in dispute, "[t]he primary rule of construction is that the intent of the conveyor is normally determined by the language of the conveyance read as an entirety and in the light of the surrounding circumstances." Hammett v. Rosensohn, 26 N.J. 415, 423, 140 A.2d 377 (1958); see also Camp Clearwater, Inc. v. Plock, 52 N.J.Super. 583, 596, 146 A.2d 527 (Ch.Div.1958), aff'd, 59 N.J.Super. 1, 157 A.2d 15 (App.Div. 1959), certif. denied sub nom., Camp Clearwater, Inc. v. Wilson, 32 N.J. 348, 160 A.2d 846 (1960).
Here, the Declaration does not expressly discuss the concept of transition, nor have our courts addressed the precise issue of when a transition has occurred in which the developer cedes to a homeowner's association, or similarly empowered organization, the rights and duties under an easement to maintain common facilities for the benefit of the property owners in a planned development. N.J.S.A. 45:22A-47. Therefore, the intent of the developer as to the existence, timing, and scope of an easement in favor of the Association to maintain the detention basin must be derived from the terms of the overall Declaration and the circumstances surrounding its adoption.
In this case, we find that the intent of the developer is intertwined with the statutory provisions governing his conduct in developing and offering for sale a community development. Where, as here, a developer purchases property with plans to create a residential/commercial development, the developer is subject to the provisions of "The Planned Real Estate Development Full Disclosure Act" (the Act), N.J.S.A. 45:22A-21 to -48. Under the Act, the developer must, among other things, register the development, N.J.S.A. 45:22A-26, and issue a public offering statement, N.J.S.A. 45:22A-28. In addition, the developer must "organize or cause to be organized an association whose obligation it shall be to manage the common elements and facilities." N.J.S.A. 45:22A-43. "The association shall be formed on or before the filing of the master deed or declaration of covenants and restrictions, and may be formed as a for-profit or nonprofit corporation, unincorporated association, or any other form permitted by law." Ibid.
The legislative history elaborates on the purpose for requiring a developer to organize an association to manage the elements and facilities common to the development:
Senate Bill No. 217(1R) addresses the transition of control over the common elements and facilities in planned real estate developments (PREDs) from a developer to an association composed of unit owners. PREDs include condominiums, cooperatives, and various other "common-interest communities" that combine individual occupancy or lots or *185 units with communal ownership and management of common elements serving those lots or units. The procedure and standards set forth in the bill are intended to prescribe a consistency of management methods in all types of PREDs, and to safeguard the interests of the individual owners or occupants.
The bill incorporates into statutory law certain provisions already existing in the PRED regulations of the Department of Community Affairs (DCA). The bill adopts the DCA regulations which require a developer to organize an association to manage the common elements and facilities of the development and which establish a timetable for transfer of control of the association from the developer to unit owners.
[Assembly Local Government Committee Statement, Senate, No. 217, L. 1993, c. 30 (emphasis added).]
Moreover, the Act itself provides that "[t]he association shall exercise its powers and discharge its functions in a manner that protects and furthers the health, safety, and general welfare of the residents of the community." N.J.S.A. 45:22A-44b.
Thus, it was clearly the intent of the Legislature to protect the interests of individual owners of property that constitute a planned development by requiring that a developer form an association to manage and maintain in perpetuity the facilities of that development that exist for the common benefit of these individual property owners. As a result, the legislative purpose bears on and cannot be separated from the intent of a developer who drafts a declaration of the rights and responsibilities of the property owners and the association formed to protect their common interests. In other words, the developer's intent must be, at least in part, to draft a declaration in compliance with the requirements of the Act and the purpose underlying its provisions.
Against this backdrop, we must determine whether, well after a developer has gone bankrupt, but absent any evidence that a "formal transition" from the developer to the Association as to the duty to maintain the common facilities of the development has occurred, transition of those duties has, as a matter of law, taken place. In the circumstances presented here, we find these duties have been transferred. First, the detention basin in question was constructed to serve the common interests of the individual property owners of the development. Hence, the detention basin was intended to be a limited community facility as defined in the Declaration. More importantly, we find it inconceivable that it was the intent of the Legislature, or of the developer upon drafting the easement provisions described above, that in the event of the developer's bankruptcy the easement in favor of the Association should not be given effect. To hold otherwise would allow the Association to disclaim any responsibility as to the very duties it was almost exclusively formed to assume simply because there was not a formal declaration that these duties had been transferred to it by the developer. Once the developer went bankrupt after the near completion of the development, we have no hesitation in concluding that a de facto transfer to the Association of those rights and obligations under the easement provisions contained in the Declaration occurred. We reject defendants' suggestion that in such circumstances the property owners are left in a legal limbo. Indeed, such an argument, put forward by the very Association created to protect the interests of its members, borders on the unconscionable.
We further reject defendants' claim that the motion judge erred by failing to give weight to the opinion of their expert *186 who concluded that a transition of the detention basin to the Association from the developer was necessary for the Association to be subject to the easement provisions; thus, they argue, no duty on the part of the Association to maintain the basin existed. However, it is within the province of the court, not an expert, to make a legal determination whether the Association was under a duty to maintain the detention basin:
[E]xpert testimony is useful to fact finders in determining whether a standard of conduct has been violated[,] but only after a legal duty has been found to exist. The question of whether a duty exists is a matter of law to be decided by the judge alone in the context of the circumstances of each case.
[Burroughs v. City of Atlantic City, 234 N.J.Super. 208, 220-21, 560 A.2d 725 (App.Div.1989).]
Defendants also claim that even if the Association held an easement to maintain the detention basin, nothing in the declaration imposed upon it a separate duty of inspection. Even plaintiffs' expert, defendants say, drew a distinction between inspection and maintenance. Therefore, defendants claim that the trial judge erred in finding that the Association had a duty to inspect the basin. The distinction between maintenance and inspection is relevant under these facts because plaintiffs' expert concluded that even if the basin had been perfectly maintained, the flood damage to plaintiffs' property would have occurred. However, that expert also found that the damages could have been averted if the Association had inspected the basin because the inspection would have disclosed the absence of an outlet pipe and the inadequacy of the basin's overflow mechanism; these factors having contributed to the flooding of plaintiffs' properties.
It is well established that, as a general rule and absent a contrary agreement, the holder of an easement has a duty to maintain and repair the property/facility on a servient tenement subject to the easement. See Lake Lookover Property Owner's Ass'n v. Olsen, 348 N.J.Super. 53, 67, 791 A.2d 270 (App.Div. 2002); Island Improvement Ass'n of Upper Greenwood Lake v. Ford, 155 N.J.Super. 571, 574-75, 383 A.2d 133 (App.Div. 1978); Ingling v. Public Service Electric & Gas Co., 10 N.J.Super. 1, 10-11, 76 A.2d 76 (App.Div.1950); Braun v. Township of Mantua, 270 N.J.Super. 404, 408, 637 A.2d 238 (Law Div.1993); 2 Thompson, Real Property, § 428 at 666-67 (1980).
In addition, we have specifically found that a duty to inspect property subject to an easement exists as to the easement holder. See Ingling, supra, 10 N.J.Super. at 10-11, 76 A.2d 76. In Ingling, two utility companies held a recorded easement to anchor a guy wire to the side yard of plaintiff's home. Id. at 4, 76 A.2d 76. Plaintiff was injured when his foot struck the metal shield covering the guy wire where it was anchored to the ground. Ibid. Plaintiff raised tort claims asserting, among other things, negligent maintenance of the guy wire and protective covering which had fallen into a state of disrepair. Id. at 9-10, 76 A.2d 76. In addressing this issue, the court stated:
[T]he defendants were under an affirmative duty to make reasonable inspections of their easement upon plaintiff's property and to use due care to keep the guy wires and [protective covering] in good repair.... Plaintiff, as owner of the servient tenement was not bound, in the absence of his agreement assuming the obligation, to keep the easement in repair or to sustain any expense in maintaining it in proper condition; he could not interfere with defendants' enjoyment of it; since it was their property, theirs was the duty of examination and repair and as owners of the dominant estate they had a right of access to *187 and could enter upon the servient estate for th[at] purpose. And so, "where the easement is of the character that want of repair injuriously affects the owner of the servient land, it becomes not only the right but the duty of the owner of the easement to cause all necessary repairs to be made."
This duty of defendants imposed upon them the same obligations of inspection and repair which are imposed upon a landlord who covenants with his tenant to "examine and repair," in which case his agreement is construed "as by plain implication creating an obligation on the part of the landlord to use due care, in the interest of the tenant, to examine and repair" to prevent conditions causing injury, which "duty of care normally involves the duty of making reasonable inspection at proper times and of reasonable diligence in making repairs looking to the safety of the premises if such reasonable inspection disclose defective conditions"; where the duty of reasonable inspection obtains, "it follows that negligence could be inferred from lack of such inspection; and if such negligence were the proximate cause of injury to plaintiff, there would be liability...."
The [protective metal covering] had been in place for 16 years at the time of the accident; when and how the defects occurred does not appear. The defendants' duty was to make a reasonable inspection of it and of the guy wires at proper times and to use reasonable diligence in making repairs when reasonable inspection disclosed defective conditions or when the defects were otherwise known to them.
[Ingling, supra, 10 N.J.Super. at 10-12, 76 A.2d 76. (citations omitted) ]
We conclude the general rule of Ingling, that an easement holder has an affirmative duty to make reasonable inspections of the easement upon the servient tenement, is controlling in this case. Once the Association came under a duty to maintain the detention basin as a common facility of the development, it became equally obligated under the easement to make reasonable periodic inspections of the basin.
In further support of this duty to inspect, Section 615 of the Atlantic County Development Standards (Development Standards) states that detention and retention basin "[d]rainage systems must be inspected on a routine basis to ensure that they are functioning properly. Inspections shall be conducted at a minimum of semiannually and always after major storms." Although the Development Standards refer to the inspection duty as being one of the property owners, they also state that the overall "responsibility for operation and maintenance of stormwater facilities" falls to the property owner. Thus, once the Association assumed the maintenance responsibilities under the easement for the detention basin, they also became the "property owners" for purposes of conducting routine inspection of the detention basin. To apply the term "property owner" under the Development Standards consistently, the property owner who is charged with overseeing the overall operation and maintenance of the storm water facilities must also be subject to the duty to inspect the detention basin which forms part of the storm water facility. Therefore, once a de facto transition of the maintenance duties under the easement had occurred, under the authority of Ingling and the pertinent Development Standards, the Association had a legal duty to inspect the detention basin in question.
As a result, Judge Previti's pre-trial determinations concerning the legal duty of the defendants with respect to inspection and maintenance of the detention basin are unassailable and, there being no challenge to the jury's finding of proximate care, the *188 verdict and judgment thereon are affirmed.
Affirmed.
NOTES
[1] Judge Fall did not originally participate in this case, but has, with the consent of counsel, been added to the panel deciding the matter.