986 A.2d 731 (2010)
411 N.J. Super. 439
Paul ROSEN, as beneficial interest holder, and Wendy H. Rosen and Steven F. Gadon, as trustees on behalf of the Rosen Trust, Plaintiffs-Appellants,
v.
Peter KEELER and Eileen Keeler, husband and wife, Defendants-Respondents.
A-0555-08T2
Superior Court of New Jersey, Appellate Division.
Argued November 30, 2009.
Decided January 27, 2010.
*733 Richard D. Gallucci, Jr., Philadelphia, PA, argued the cause for appellants (Spector Gadon & Rosen, P.C., attorneys; Mr. Gallucci, of counsel and on the brief).
Kevin J. Coakley, Roseland, argued the cause for respondents (Connell Foley, LLP, attorneys; Mr. Coakley, of counsel and on the brief; Agnes Antonian, on the brief).
Before Judges LISA, ALVAREZ and COBURN.
The opinion of the court was delivered by
LISA, P.J.A.D.
This case involves a dispute regarding a beach access easement. The property is located in the Township of Long Beach, on a portion of Long Beach Island known as Loveladies. Plaintiffs, who we will generally refer to as the Rosens or the Rosen family, brought this action seeking enforcement of a claimed access easement over the beachfront property owned by defendants, Peter and Eileen Keeler. The parties filed cross-motions for summary judgment. Judge Buczynski granted the Keelers' motion and denied the Rosens' motion. He then denied the Rosens' reconsideration motion. Final judgment was entered, the result of which was to deny the Rosens the right of access to the ocean across the Keelers' property. The judge stayed the judgment pending appellate review.
The Rosens base their asserted right of easement on certain documents which they contend granted the right. They argue (1) the judge erred in his interpretation of those documents, (2) alternatively, material facts are in dispute regarding the circumstances surrounding the preparation and execution of the documents, (3) case law in other jurisdictions supports their position, and (4) allowing beach access to the Rosens will not overburden the Keelers' property, as a result of which the principles undergirding the trial court's decision are not furthered by precluding such access. The Rosens further argue that the judge erred in denying their reconsideration motion. We reject these arguments and affirm.

I
The properties involved in this dispute lie on a narrow strip of Long Beach Island situated between the Atlantic Ocean and the Barnegat Bay and are separated by Long Beach Boulevard, with oceanfront lots to the east and bayfront lots to the west. The Rosens own a bayfront lot. The Keelers own the property directly across the boulevard, which, as we will explain, was subdivided by its previous *734 owner into two lots. One of those lots has frontage on the boulevard (boulevard lot). The other fronts the ocean (ocean lot), but is configured as a "flag" lot, with a twenty-five foot portion running along the southerly side of the boulevard lot to prevent the ocean lot from being landlocked and to provide it access to Long Beach Boulevard.
Prior to 1978, Robert and Ellen Seltzer owned all of the property now owned by the Keelers as a single lot. In 1978, the Seltzers subdivided the lot into its current status. They intended to sell the boulevard lot and retain the ocean lot. In order to make the boulevard lot marketable, the Seltzers executed and recorded a "DECLARATION OF EASEMENTS AND RESTRICTIONS," which created an easement appurtenant which burdened the ocean lot and benefited the boulevard lot by granting to the owners of the boulevard lot, their family, and their invited guests, the right to cross over a five-foot strip of land along the northerly edge of the ocean lot for the purpose of accessing the beach. More particularly, the Declaration provided in relevant part:
1. The owner of Tract A [the boulevard lot] shall have a perpetual, irrevocable right and easement over that certain strip of land five (5) feet in width (herein called "5 Foot Strip") along the entire northernmost side of Tract B [the ocean lot] for use by the owner of Tract A, members of his family and his invited guests, as a pedestrian walkway to permit ingress and egress to and from the Atlantic Ocean. The right granted herein to the owner of Tract A to use the 5 Foot Strip shall be in common with the owner of Tract B. The owner of Tract A shall be responsible for repairing all damage caused to the 5 Foot Strip by the wrongful acts or negligence of such party, or members of his family, or other invited guests.
....
6. No structure, barriers, fences, obstructions or other improvement may be placed or erected upon any of the 5 Foot Strip [or other areas][1] ... on which easements have been created hereunder, and there shall be no act or conduct which shall interfere with the free and uninterrupted use of the easements herein created....
....
8. The grants, easements, covenants and declarations herein made shall be deemed covenants running with the land and shall bind and inure to the benefit of the owner of Tract A and the owner of Tract B, and their heirs, personal representatives, assigns and successors in title.

[Emphasis added.]
In 1978, the Seltzers sold the boulevard lot to Edward and Barbara Edelstein, retaining ownership for themselves of the ocean lot. The Rosens purchased their bayfront lot in 1986. Because of their friendship with the Edelsteins and Seltzers, the Rosens utilized the footpath for beach access across both the boulevard and ocean lots ever since they purchased their bayfront lot.[2]
*735 On July 19, 1999, the Keelers contracted with the Seltzers to purchase the ocean lot. Settlement was scheduled for October 22, 1999. On August 12, 1999, Paul Rosen wrote to Robert Seltzer asking that he fulfill an earlier informal commitment that if the ocean lot was ever sold he would convey to Rosen an easement for beach access over it. On October 13, 1999, the Rosens, Edelsteins, and Seltzers executed a document entitled "ACCESS EASEMENT." This document created two easements, one burdening the Edelstein tract (the boulevard lot) and one burdening the Seltzer tract (the ocean lot). Both were for the benefit of the Rosen property to enable the Rosens to use the "5 Foot Strip" along the northerly edge of the ocean lot created by the 1978 Declaration. In relevant part, the 1999 Access Easement provided:
WHEREAS, the Edelstein Tract and the Seltzer Tract are benefitted [sic] and burdened by that certain Declaration of Easements and Restrictions dated October 9, 1978 and recorded [in deed book and page in the Ocean County Clerk's Office], the terms and provisions of which are incorporated herein by reference for all purposes; and
WHEREAS, pursuant to the [1978] Declaration of Easements and Restrictions, the owner of the Edelstein Tract has a perpetual, irrevocable right and easement over a certain strip of land five (5) feet in width (defined in the Declaration of Easements and Restrictions as [and hereinafter called] the "5 Foot Strip") along the entire northernmost side of the Seltzer Tract ... to permit ingress and egress to and from the Atlantic Ocean; and

WHEREAS, Edelstein desires to grant to the owner of the Rosen Tract an easement over the Edelstein Tract for use by the owner of the Rosen Tract, Paul R. Rosen and/or Wendy H. Rosen, their family members, and invited guests, for pedestrian access to the 5 Foot Strip to permit ingress and egress to and from the Atlantic Ocean; and

WHEREAS, Seltzer desires to grant to the owner of the Rosen Tract an easement over the 5 Foot Strip for use by the owner of the Rosen Tract, Paul R. Rosen and/or Wendy H. Rosen, their family members, and invited guests, as a pedestrian walkway to permit ingress and egress to and from the Atlantic Ocean.
NOW, THEREFORE ... the parties hereto agree as follows:
1. Edelstein hereby grants, bargains, sells, transfers and conveys unto the owner of the Rosen Tract a perpetual and irrevocable easement and right-of-way for pedestrian access over the Edelstein Tract, for use by the owner of the Rosen Tract, Paul R. Rosen and/or Wendy H. Rosen, their family members, and invited guests, to permit ingress and egress to and from the 5 Foot Strip.

2. Seltzer hereby grants, bargains, sells, transfers and conveys unto the owner of the Rosen Tract a perpetual and irrevocable easement and right-of-way over the 5 Foot Strip, for use by the owner of the Rosen Tract, Paul R. Rosen and/or Wendy H. Rosen, their family members, and invited guests, as a pedestrian walkway to permit ingress and egress to the Atlantic Ocean.

....
7. This Easement Agreement, the easements herein granted and all of the terms, provisions and obligations hereof shall be covenants running with the land affected thereby, and shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, executors, administrators, successors and assigns.

*736 8. .... [T]his Easement Agreement and the easements herein granted shall be and remain in full force and effect as long as the Rosen Tract is directly or indirectly owned and/or occupied, in whole or in part, by the Rosen Trust or Paul R. Rosen and/or Wendy H. Rosen and/or their respective family members, or Trusts for same.
[Emphasis added.]
The 1999 Access Easement was recorded in the Ocean County Clerk's Office on October 21, 1999. The easement created by this recorded instrument was unacceptable to the Keelers, who refused to complete the purchase unless the new easement in favor of the Rosens across the ocean lot was removed. Paul Rosen proposed a solution by which the Access Easement over the ocean lot would be canceled, but the cancellation agreement would contain a provision (paragraph two below) stating that the cancellation did not affect the easement created over the boulevard lot, owned by the Edelsteins. On October 25, 1999, the Rosens executed a document entitled "CANCELLATION OF ACCESS EASEMENT ACROSS `SELTZER TRACT,'" which provided in relevant part:
WHEREAS a certain Access Easement was conveyed to the ROSEN TRUST on October 13, 1999 by ELLEN SELTZER and BARBARA EDELSTEIN [sic] and recorded in the Ocean County Clerk's Office, [in deed book and page]; and
....
WHEREAS it is the intent of this Cancellation Agreement to extinguish any and all rights, title and interest that the Rosen Trust, Wendy H. Rosen and Paul R. Rosen, their successors and assigns, may have to the property owned by Ellen Seltzer, known as the Seltzer Tract (See Exhibit "B");
NOW THEREFORE ... intending to be legally bound, the parties hereto agree as follows:
1. That all rights, title, interests, access, use and enjoyment of the `Seltzer Tract' given to the Rosen Trust, their successors and assigns, by the heretofore mentioned Access Easement dated October 12, 1999 and recorded [in deed book and page] are hereby permanently and forever extinguished.

2. That nothing in this Cancellation Agreement is intended to directly or indirectly limit and/or restrict the Access Easement granted to the Rosen Trust by Barbara Edelstein in the above mentioned Access Easement.

[Emphasis added.]
The title insurance company that would guarantee the Keelers' title was satisfied that the Cancellation Agreement was sufficient to extinguish the 1999 Access Easement and removed it as an exception to the title insurance policy. The Cancellation Agreement was recorded in the Ocean County Clerk's Office on October 28, 1999. Satisfied that the Rosens' easement rights over the ocean lot had been extinguished, the Keelers agreed to complete settlement, and on October 28, 1999, the Seltzers executed a deed conveying to them the ocean lot.
After these events, the Rosens continued using the footpath for beach access across both the boulevard and ocean lots. They retained the legal right to cross the boulevard lot by virtue of the second easement created in the 1999 Access Easement, burdening the Edelstein lot in favor of the Rosen property, which was expressly not extinguished by the Cancellation Agreement. Although the parties dispute that the Cancellation Agreement extinguished the Rosens' direct legal right to cross the ocean lot, there is no dispute that, following execution of the Cancellation *737 Agreement and the sale of the ocean lot to the Keelers, the Rosens continued to enjoy the ability to cross the ocean lot as the invited guests of the Edelsteins under the 1978 Declaration.
This situation changed on October 13, 2003, when the Keelers purchased the boulevard lot from the Edelsteins. The dispute did not arise until 2006, however. As we previously explained, see n. 2, supra, only a small portion of the footpath actually crossed the northwest corner of the ocean lot before veering off onto the neighbor's property. According to the Keelers, they were not aware during this intervening period that the Rosens continued to use that small portion of the ocean lot for beach access across the historical path.
Sometime in 2005, the Keelers decided to demolish the former Edelstein residence and construct a guest house and swimming pool. As part of this project, in spring 2006, a privacy fence and retaining wall were erected, blocking the footpath on the ocean lot. Members of the Rosen family were thus prevented from using the path.
Through an exchange of correspondence, the parties expressed their respective positions. Paul Rosen, an attorney, contended that in executing the cancellation agreement, he merely accommodated Keeler by extinguishing the "new Easement of record on his Deed and Mortgage," while at the same time, "condition[ing] the dismissal by reserving all my rights to access the beach across the Seltzer property by using the existing Edelstein Easement which had been in existence since 1978." Thus, the Rosens took the position that the preserved portion of the 1999 Access Easement creating an easement over the Edelstein lot provided them with access rights, by virtue of the 1978 Declaration which had been incorporated therein, to cross over the ocean lot as well. The Rosens contended that the three operative documents caused their family and their lot to step into the shoes of the Edelsteins and the boulevard lot as assignees of the 1978 easement. They contended that, because the 1999 Access Easement over the boulevard lot runs with the land, so did the assignment of the 1978 easement over the ocean lot, even after the Keelers acquired title to the boulevard lot.
The Keelers contended that, with their acquisition of the boulevard lot, the Rosens no longer had permission to cross over the ocean lot for beach access as invited guests of the owners of the boulevard lot. The Keelers acknowledged (and continue to acknowledge) that by virtue of the 1999 Access Easement, the Rosens retain the easement conveyed to them by the Edelsteins to cross the boulevard lot. However, that easement, by its terms, is only over the boulevard lot. That easement grants the Rosens "ingress and egress to and from the 5 Foot Strip," which, by definition, is the beginning point of the footpath on the ocean lot. Therefore, in effect, the Rosens access right reached a dead end at the boundary between the boulevard and ocean lots.

II
On June 14, 2007, the Rosens initiated this action in the Chancery Division seeking enforcement of their asserted easement across the ocean lot.[3] After discovery was completed, the parties filed cross-motions for summary judgment, stipulating that no material facts were in dispute. On June 20, 2008, after hearing oral argument, Judge Buczynski issued a thorough *738 and well-reasoned oral decision. He framed the issue as follows:
So the question really is whether or not as a matter of law what these agreements mean and what their intent was at that point in time.
Clearly, it was the intent of the Seltzers to provide access between the Boulevard lot from the Boulevard all the way through the ocean in their original Declaration of Easements and Restrictions. It was clearly the intent of the Edelsteins ... to provide the ability of the Rosens to traverse their own particular lot with the direct easement and either by guest or by legal right provide access to the ocean for the Rosens over the lot which was burdened by the Edelstein easement....
The question is, does that run with the land? Is it an easement appurtenant? Is it a hybrid of some way that it's not only easement appurtenant but also in some way look as if it's an easement in gross, ... and whether or not the Edelsteins can actually assign their right to traverse the ocean from [their] lot to some third party that has no interest in this particular Boulevard lot, but rather across the Boulevard on the other side to provide access over that particular easement? ...
... The question is whether or not the Edelsteins had a right as a matter of law, regardless of what they thought they could or could not do to transfer an interest in their easement, ... over the oceanfront lot to a third party who was not directly impacted by this lot whatsoever.

[Emphasis added.]
Interpreting the documents with any eye toward whether the Edelsteins could have possessed the power to grant the Rosens an easement over the ocean lot by assigning their rights under the 1978 Declaration, the judge concluded:
The Court's reading of that language is a far more traditional view.... It's been tried and tested in our Courts and it is traditionally interpreted not to mean an assignment other than [that] which affects the dominant piece of property. Therefore, when one talks about one's successors and assigns, we talk about the successor and assign to that particular property, not an assignment to some third party. To be an assignment to some third party would really take it out of an interpretation that it was an easement appurtenant but rather almost an easement in gross where it could be transferred to some third party.
....

I am satisfied that ... as a matter of law in New Jersey on easement appurtenant they are not assignable to third parties other than those who would take an interest in the actual dominant estate. That's not the law. Otherwise, it would really change the complexion of New Jersey law where you could actually assign your easements to any third party, and it really defies the normal and traditional interpretation of these agreements.
....
But I'm satisfied that based on the totality of the circumstances the law in New Jersey does not permit the Edelsteins to convey an easement appurtenant to a third party by way of assignment based on the language contained in the easement that they received. That is an easement that benefits the Boulevard lot. It is appurtenan[t] to the Boulevard lot. It is not transfer[]able as a matter of law unless clearly and specifically provided for in the agreement itself. That's *739 traditional language and there is nothing other than traditional language there. Unfortunately for the Rosens, there is no language, there is no legal right in the Edelsteins to provide the legal right to traverse the oceanfront property on that five-foot strip because of the way this language was ultimately contained in the agreement.
[Emphasis added.]
Accordingly, the judge granted the Keelers' motion for summary judgment. As we earlier stated, the judge stayed his order pending this appeal. In denying the Rosens' reconsideration motion, the judge reaffirmed the reasoning of his initial decision, and also refused to consider the mutual mistake of law argument presented by the Rosens, which was raised for the first time in the reconsideration motion.

III
As relevant to this case, the law recognizes two types of easements, easements appurtenant and easements in gross. The distinction is "`that an easement appurtenant requires a dominant tenement to which it is appurtenant, whereas an easement in gross belongs to its owner independently of his ownership or possession of any specific land.'" Vill. of Ridgewood v. Bolger Found., 104 N.J. 337, 340, 517 A.2d 135 (1986) (quoting Weber v. Dockray, 2 N.J.Super. 492, 495, 64 A.2d 631 (Ch.Div.1949)). An easement appurtenant is created when the owner of one parcel of property (the servient estate) grants rights regarding that property to the owner of an adjacent property (the dominant estate). Ibid. The easement appurtenant "enhances the value of the dominant estate and cannot exist separate from the land itself." Ibid. (citing Am. Rieter Co. v. Dinallo, 53 N.J.Super. 388, 392, 147 A.2d 290 (App.Div.1959)). By contrast, an easement in gross benefits no specific parcel of land and remains independent of and unconnected to the ownership or possession of any particular tract. Ibid. When a grant appears to create rights connected to the grantee's ownership of a certain piece of property, there is a presumption favoring construction as an easement appurtenant. Weber, supra, 2 N.J.Super. at 495, 64 A.2d 631.
Questions concerning the extent of the rights conveyed by an easement require a determination of the intent of the parties as expressed through the instrument creating the easement, read as a whole and in light of the surrounding circumstances. Poblette v. Towne of Historic Smithville Cmty. Ass'n, Inc., 355 N.J.Super. 55, 63, 809 A.2d 178 (App.Div.2002); Hyland v. Fonda, 44 N.J.Super. 180, 187, 129 A.2d 899 (App.Div.1957). "[W]hen the intent of the parties is evident from an examination of the instrument, and the language is unambiguous, the terms of the instrument govern." Hyland, supra, 44 N.J.Super. at 187, 129 A.2d 899.
When the language of the grant is ambiguous, the surrounding circumstances, including the physical conditions of the servient tenement and the requirements of the grantee, play a significant role in the determination of the controlling intent. Khalil v. Motwani, 376 N.J.Super. 496, 503, 871 A.2d 96 (App.Div.2005). In determining what the parties intended, "there are no limits on the kinds or combinations of servitude benefits that can be created," and "the full range of possibilities should be kept in mind" while interpreting the language of the instrument creating the easement in light of the circumstances of its creation. Id. at 501, 871 A.2d 96 (quoting Restatement (Third) of Property: Servitudes § 2.6 comment c (2000)).
New Jersey courts have uniformly held that use of the word "assign" in easements *740 appurtenant or restrictive covenants means that the parties intended the benefit to run with the land. See Olson v. Jantausch, 44 N.J.Super. 380, 387-88, 130 A.2d 650 (App.Div.1957); see also Perelman v. Casiello, 392 N.J.Super. 412, 418-19, 920 A.2d 782 (App.Div.2007); Amir v. D'Agostino, 328 N.J.Super. 141, 146, 744 A.2d 1233 (Ch.Div.1998), aff'd, 328 N.J.Super. 103, 744 A.2d 1212 (App.Div.2000). In Khalil, supra, 376 N.J.Super. at 502 n. 3, 871 A.2d 96, quoting Olson, supra, 44 N.J.Super. at 388, 130 A.2d 650, we commented that "[w]e would assume that `assign,' in this context, `comprehends all those who take either immediately or remotely from or under the assignor, whether by conveyance, devise, descent or act of law.'" Conversely, the benefits of an easement in gross may be assigned to a third party. See, e.g., Weber, supra, 2 N.J.Super. at 496, 64 A.2d 631.
Treatises dealing with the topic are in universal agreement that absent a clear intent to the contrary in the instrument creating the easement an easement appurtenant benefits only those with a possessory interest in the dominant estate, and such benefit cannot be assigned to third parties independent of the dominant land to which it is appurtenant: 4 Powell on Real Property § 34.15 at XX-XXX-XXX-XX (Wolf ed. 2009) (In discussing the effect of subdividing the dominant tenement, "[s]ome increase in burden can result from the increase in the number of users, but such increase in burden is kept within limits by the fact that any easement appurtenant has its total extent defined by the needs of the dominant estate."); Restatement (Third) of Property: Servitudes § 4.11 (2000) ("Unless the terms of the servitude determined under § 4.1 provide otherwise, an appurtenant easement or profit may not be used for the benefit of property other than the dominant estate.")[4]; Roger A. Cunningham et al., The Law of Property § 8.10 at 461 (1984) ("The word `appurtenant' signifies that an easement appurtenant is attached to and a part of the right of possession of its dominant tenement.... Therefore, any act that is sufficient to transfer title or even rightful possession of the dominant tenement will carry the easement rights with it.... Nor may the easement be transferred separately from the dominant tenement, for `appurtenant' also signifies that the easement may serve only the dominant tenement, as we have seen."); 2 American Law of Property § 8.73 at 285 (1952) ("Even rarer are cases in which the intention appears to permit what was created as an easement appurtenant to be changed into an easement in gross. Hence it will be assumed, in the absence of an affirmative showing to the contrary, that an appurtenant easement cannot be divorced from the dominant tenement in such a way as to permit it to become an easement in gross or become appurtenant to another tenement.") (Emphasis added).
The gravamen of the Rosens' argument rests on their contention that although they extinguished their direct easement rights over the ocean lot through the Cancellation Agreement they retained such rights derivatively through the remaining easement over the boulevard lot granted by the Edelsteins in the 1999 Access Easement. This easement was expressly retained by paragraph two of the Cancellation Agreement. The Rosens argue that, because the 1999 Access Easement incorporated by reference all provisions of the 1978 Declaration, the "assigns" language in the Declaration gave the Edelsteins the ability to assign to them their *741 easement over the ocean lot as well as the undisputed right to cross the boulevard lot. We do not agree.
As the treatises and cases state, an easement appurtenant cannot be transferred or assigned for the benefit of another tenement separate from the dominant estate unless the instrument creating it demonstrates a clear intent to grant such a right. The pivotal question comes down to whether the 1978 Declaration evinces a clear intent on the part of the grantors, the Seltzers, to allow the future owners of the boulevard lot to assign their easement rights over the ocean lot to third parties unrelated to the ownership or possession of the boulevard lot. As Judge Buczynski found, absent some provision in the 1978 Declaration demonstrating an intent to permit such an assignment, it does not matter what easement rights the Edelsteins and Rosens thought they could convey in relation to the ocean lot.
The plain terms of paragraph one of the 1978 Declaration create an easement over the "5 Foot Strip" on the northern portion of the ocean lot for use by the owners of the boulevard lot, their family members, and invited guests, which easement is held in common with the owner of the ocean lot. Paragraph eight states that the easements created "shall be deemed covenants running with the land and shall bind and inure to the benefit of the owner of Tract A and the owner of Tract B, and their heirs, personal representatives, assigns and successors in title."
The purpose of paragraph one was for the Seltzers to grant beach access to whomever was to buy the boulevard lot in order to make the boulevard lot more marketable. This intent is supported by the surrounding circumstances, in which the Seltzers created and recorded the easement in 1978 when they put the boulevard lot on the market, and then sold it to the Edelsteins in the same year.
The purpose of paragraph eight is to clarify the Seltzers' intent that the benefit of beach access for the owners of the boulevard lot should run with the land. This clarification would hold value in itself because the buyers of the boulevard lot, the Edelsteins, would be assured that if they ever decided to resell the property they too would reap the increased value and marketability associated with subsequent purchasers also enjoying convenient beach access across the "5 Foot Strip" on the ocean lot. The word "assigns" only appears in the "running with the land" clause. As we found in Khalil, supra, 376 N.J.Super. at 502, 871 A.2d 96, where the language did not explicitly state "runs with the land," the effect of the "heirs and assigns" language is to communicate that successors to the owner's possessory interest in the dominant estate will succeed to the easement rights as well.
In this context, "heirs, personal representatives, assigns and successors in title" means "running with the land." The question is whether this is all that it means. The Rosens focus on the word "assigns," while the Keelers focus on the words "successors in title." The Keelers argue that the "assigns" referred to in the 1978 Declaration are "limited to assigns in title." On this point, an example from the Restatement (First) of Property § 487 comment h, illustration 6 (1944), later played out in the facts of Khalil, provides a concrete example of how one might be an "assign" under the terms of the Declaration without being a "successor in title." The illustration states that if the owner of a dominant estate entered into a lease for a term of years with a tenant, the lease document would entitle the tenant to possession of the land and thus also entitle the tenant to use of the easement. The tenant would gain an assignment of the easement rights through his or her leasehold interest while not succeeding to the fee simple title *742 held by the owner. Thus, courts need not interpret one or the other of the two terms to be without meaning because effect can be given to each.
Regarding the pivotal question, we agree with Judge Buczynski that the terms of the 1978 Declaration do not provide evidence of a clear intent on the part of the Seltzers to allow the future boulevard lot owners to assign their access easement over the "5 Foot Strip" without conveying some interest related to the boulevard lot itself. The word "assigns" only appears within the context of the "running with the land clause" and is no more than a boilerplate term designed to effectuate that underlying intent by capturing all possible successors to the grantors' and grantees' interests in the respective lots. The language does not constitute a clear statement that the easement can be assigned irrespective of the boulevard property.
The circumstances surrounding the grant also support this interpretation. The Seltzers intended to grant the easement to incoming homeowners of the boulevard lot, not out of friendship or altruism, but because it would aid their ability to sell the lot and increase its value. Because the Seltzers retained ownership of the ocean lot, presumably those considerations were tempered by and weighed against the burdens of having one's neighbors and their guests crossing over the property. If the terms of the 1978 Declaration were strained to find a right of assignment, there is nothing in the document to limit the number of assignees. The Seltzers could not have intended for the eventual owners of the boulevard lot to have the ability to assign the right to use the "5 Foot Strip" to what could potentially become a limitless number of persons. Instead, the burden of having one family and its invited guests cross over their property was all the Seltzers intended to create.
Judge Buczynski correctly analyzed the terms of the documents themselves and found no language to support a right of assignment in the Edelsteins absent their conveyance of an interest in the land itself. Viewing those terms in their entirety and in the larger context, he found that "when one talks about one's successors and assigns, we talk about the successor and assign to that particular property, not an assignment to some third party." The judge correctly applied the law, and his interpretation of the language in the operative documents comported with the Seltzers' original intent.
We further note that even if the 1978 Declaration conferred to the Edelsteins the right to assign the easement over the ocean lot to a third party unconnected to the boulevard lot, the language of the 1999 Access Easement did not purport to do so. As we have pointed out, the easement, by its terms, was only over the Edelstein Tract (the boulevard lot) "to permit ingress and egress to and from the 5 Foot Strip." (Emphasis added). Therefore, the easement granted by the Edelsteins to the Rosens ended where the ocean lot began.
Finally, even if the 1978 Declaration allowed for an assignment of the benefit apart from an interest in the boulevard lot, and even if the 1999 Access Easement made such an assignment from the Edelsteins to the Rosens, a further question arises as to whether that element of the Edelstein easement was canceled by the Cancellation Agreement. In our view, the plain terms of the Cancellation Agreement operated to extinguish "any and all" rights that the Rosens may have had over the ocean lot, including an assigned right deriving from the 1978 Declaration through the Edelstein grant of the 1999 Access Easement, if such a right did in fact exist. With respect to the ocean lot, the Cancellation Agreement restored the parties to the status quo ante.
*743 We find unpersuasive the Rosens' equitable argument that "beach access to the Rosen family will not overburden either the ocean or boulevard lots under the presently existing facts and the principles undergirding the lower court's decision are not furthered under the facts of this case." Judge Buczynski rejected this argument, and so do we. It is not dispositive that the Rosens seek only to do what they have done for many years by utilizing the historical footpath. Nor is it dispositive that the same number of family members or guests would utilize the footpath as in the past. In terms of the legal rights of the affected parties, the fact remains that as long as the Edelsteins owned the boulevard lot the Rosens had a right to use the path as their invited guests, and as long as the ownership of the two lots east of Long Beach Boulevard remained separate the ocean lot owner was always burdened with the passage of the invited guests of the boulevard lot owner. But the owner of the ocean lot has never been burdened by easement rights held by anyone unconnected to the ownership of the boulevard lot.
Through their equitable argument, the Rosens ask for a judicial molding of the easement rights which they have always wanted but could never attain apart from their positive relationship with the Edelsteins while the Edelsteins owned the boulevard lot. They ask the courts to grant them a right which has not been granted by the parties through the operative documents because, in their view, the resulting burden on the Keelers would not be a heavy one. Such a result would constitute a marked and unwarranted deviation from settled principles dealing with easements of this type. Further, equitable considerations are at least as strong (and probably stronger) in favor of the Keelers. They bought the ocean lot in reliance upon the fact that the only easement burdening it was the 1978 Declaration favoring the boulevard lot. They would not have purchased the ocean lot if the easement right granted by the Seltzers to the Rosens was not canceled. It was canceled, thus clearing the way for the Keelers' purchase. Now, having unified title to the two lots, the Keelers have destroyed the original easement over the ocean lot, leaving in place only the easement granted by the Edelsteins to the Rosens burdening the boulevard lot.
We find no merit in the Rosens contention that we should follow authorities from other jurisdictions. The law in this State is well settled and in conformity with the leading treatises on the subject. Finally, the Rosens' argument that the judge erred in denying their reconsideration motion lacks sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).
The judgment is affirmed; the stay of the judgment pending appeal is vacated.
NOTES
[1] The 1978 Declaration also created several utility line easements.
[2] The footpath crosses a series of sand dunes, which contain substantial vegetation. This is an "historical" footpath and does not coincide with the five-foot easement on the northerly border of the ocean lot as described in the 1978 Declaration. The path runs along the northern five-foot wide portion of the boulevard lot, but then, after crossing onto the ocean lot, continues for a relatively short distance before veering off to the north and crossing the property of the adjoining owner, which it then traverses for the substantial additional distance to the beach and ocean.
[3] One count of the complaint also sought specific performance of an alleged oral settlement agreement. The Rosens later voluntarily dismissed that count, which is not implicated in the appeal.
[4] In Khalil, supra, 376 N.J.Super. at 500-01, 871 A.2d 96, we adopted some sections of the Restatement (Third) and favorably endorsed others.