**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2894-24

PALISADIUM MANAGEMENT
CORP.,

    Plaintiff-Appellant,

v.

CARLYLE TOWERS
CONDOMINIUM ASSOCIATION,
INC.,

    Defendant-Respondent.

_____

Submitted March 24, 2026 – Decided June 16, 2026

Before Judges DeAlmeida and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-1463-23.

Bivas Law LLC, attorneys for appellant (Ariel A. Bivas, on the briefs).

Greenbaum Rowe Smith & Davis, LLP, attorneys for respondent (Alan S. Pralgever and Meredith C. Sherman, on the brief).

PER CURIAM

In this easement dispute concerning access road rights, plaintiff Palisadium Management Corporation, appeals from two related Law Division orders, issued February 19, 2025, denying its motion for summary judgment, and partially granting defendant Carlyle Towers Condominium Association's cross-motion for summary judgment. The partial grant of summary judgment enforced two separate easements pertaining to the same roadway in favor of defendant, and permanently enjoined plaintiff from obstructing access to the roadway by defendant or its condominium residents. Plaintiff also appeals from an April 3, 2025 order, which disposed of the parties' remaining claims. In light of applicable legal principles, we vacate the partial grant of summary judgment in favor of defendant and remand for further proceedings in accordance with this opinion.

I.

A.

1. The Easements

The crux of the parties' dispute surrounds the scope of defendant's authorized use of Palisadium Drive (or the roadway),[1] which runs through

_____

[1] Palisadium Drive is at times throughout the record alternatively referenced as "the service access way" or "Tower Drive." We understand these references indicate the same road.

A-2894-24

plaintiff's property and connects defendant's contiguous property to a main road, Palisade Avenue. Specifically, Palisadium Drive, a paved roadway without sidewalks, provides the only access to the front entrance of plaintiff's wedding venue, which sits between the public roadway and the rear entrance to the North Tower of Carlyle Towers Condominiums. Thus, accessing the rear entrance of the Carlyle North Tower via Palisadium Drive necessitates passing the front and only entrance to plaintiff's wedding venue. It is undisputed alternative access exists to the North Tower's front entrance via a separate public roadway.

Two easements relate to Palisadium Drive. The first was created by agreement entered in 1973 (the 1973 agreement), when the parcels of property now individually owned by plaintiff and defendant were part of the same tract (the Overall Tract). Specifically, in 1973, Centex Homes Corporation and 4606 Land Corporation (together, "Centex"), the then-owners of the Overall Tract, sought to subdivide the property in preparation for the construction of multiple condominium complexes. On August 15, 1973, to further this goal, Centex executed a "Declaration of Easements and Operating Agreement" with an express purpose "to create and establish certain easements, restrictions and obligations, binding upon and inuring to the benefit of owners and operators of

3 A-2894-24

the various portions of the Overall Tract . . . in order to provide for the full and efficient development and operation thereof."

Regarding access throughout the Overall Tract, the 1973 agreement provided in its first paragraph:

> Declarant does hereby establish and create <u>for the benefit of the owners and operators of each and every portion of the Overall Tract, and their invitees, licensees, heirs, personal representatives, successors and assigns</u>, and for the benefit of and burdening the various portions of the Overall Tract, <u>mutual, reciprocal and non-exclusive easements, licenses, rights, and privileges (i) of ingress, egress, passage and use, for pedestrians and vehicles, over all interior roadways, walkways, alleys and other access areas as, if and when located and constructed on portions of Overall Tract</u> (excluding any of the foregoing which may be located within buildings), to and from the various other portions of the Overall Tract and/or to and from any streets, roads or walkways adjoining the Overall Tract (hereinafter called the "Access Easements") <u>and</u> (ii) <u>for the use, placement, maintenance, repair, relocation and replacement of all utility lines, wires, pipes, conduits and other facilities providing for sewage, drainage, water, light, power and other forms of energy, signals or services</u> (hereinafter called the "Utility Easements") <u>in, to, upon and over any and all portions of the Overall Tract as the same may, from time to time be constructed</u> upon and by the owners of the various portions of the Overall Tract, subject to and upon the terms hereinafter described.
>
> [(Emphasis added)].

4

A-2894-24

Paragraph fourteen declared the easements upon the Overall Tract "run[]" with the land," "shall be perpetual," and "create privity of contract and/or estate" with "[e]very grantee accepting a deed to any interest in any portion of the Overall Tract."

Paragraph fifteen provided the agreement could be "abrogated, modified, rescinded or amended" or "alter[ed]" only by

> written consent of . . . 100% of the owners of the various portions of the Overall Tract, except that with respect to each portion of the Overall Tract which is submitted to the Condominium Property Act of the State of New Jersey for a condominium apartment building there shall be required the written consent of the owners of at least 75% of the total number of apartment units in such condominium building[.]

Paragraph fifteen also required any such "alteration shall be made by a declaration in writing executed by said owners . . . and duly recorded in the Office of the Recorder in and for the county in which the Overall Tract is located."

Paragraph sixteen reserved the right of the declarant, Centex,

> so long as it shall be the owner of any portion of the Overall Tract, to execute and deliver a further declaration binding the portions of the Overall Tract covered thereby granting to the general public the right of vehicle and/or pedestrian access, ingress and egress to and from Palisades Avenue, to and from Lafayette

A-2894-24

Avenue, over any roadway constructed between two such streets.

Thereafter, on May 17, 1989, plaintiff, through its then-president, and defendant's predecessor in interest, Cliffside Park Associates (Cliffside), entered into an "Easement Agreement" (the 1989 agreement). At the time, Carlyle Towers, and specifically its North Tower abutting plaintiff's property, was under construction, and the structure on plaintiff's property was operating as a health club, and had not yet become a wedding venue. The 1989 agreement expressly identified plaintiff as the owner of "Tower Drive," which is undisputedly the access road now known as Palisadium Drive. It generally stated its purpose, declaring, "[Plaintiff] has agreed to grant to Cliffside the right to use the existing roadway solely for vehicular ingress and egress to the North Tower service entrance over the property owned by [plaintiff], subject to reasonable rules and regulations to be promulgated by [plaintiff]."

The agreement further memorialized the "Grant" as follows: "[Plaintiff] hereby grants to Cliffside a non-exclusive easement appurtenant to the Carlyle Parcel solely for the purpose of permitting vehicular traffic over the Service Access Way to the service entrance located in the North Tower of Carlyle Towers." The next paragraph conferred plaintiff's "Right of Closure," clarifying the grant "shall in no wise be construed to grant rights not otherwise expressly

A-2894-24

set forth in this agreement," and "to this end, [plaintiff] shall have the right to close the Service Access Way . . . to preclude any claim of prescriptive rights or adverse possession."

In separate paragraphs, the agreement required Cliffside to maintain its property bordering the roadway in a "neat, clean, and attractive manner," and, at plaintiff's request, to "maintain, at its cost, public liability and property damage insurance in amounts reasonably acceptable to [plaintiff]" and that such insurance shall name plaintiff as "co-insureds." The agreement designated the easements and rights created by them "shall be perpetual and run with the Carlyle Parcel" and be "binding upon the owners of the respective parties, their successors and assigns."

2. Borough Involvement

In 2014, the Borough of Cliffside Park (the Borough) established a fire lane and loading zone at the end of Palisadium Drive adjacent to the North Tower's rear entrance.[2] It is unclear from the record precisely what precipitated

---

[2] The parties concur the fire lane/loading zone action taken by the Borough arose from the fire official's initiative and attempt to address informally disputes between the parties concerning Palisadium Drive access. Although described as a "mediation" by defendant's attorney in argument before the trial court, the parties have not provided any information concerning the proceedings or the parties' respective positions relative to ownership or existing access rights to

the Borough's action. In a 2014 letter from the Borough Fire Prevention Bureau to the borough attorney, the fire lanes were described by specific location for the purpose of "provid[ing] access to the public way from the Interior of Carlyle Towers." The letter also memorialized "a loading zone . . . [to] be used by the Carlyle Towers for moving items in [and] out of building." A related September 3, 2014 letter from the Borough Fire Official to plaintiff and "Carlyle Towers," stated the loading zones and fire lanes were deemed effective September 8, 2014 and expressed the "hope that all parties involved will follow the rules and cooperate with each other and the municipality."

In 2023, disputes between the parties related to Palisadium Drive continued. Plaintiff alleged misuse of the roadway, in particular by pedestrian traffic and dog walking by defendant's residents, leaving dog excrement along the property and entrance to the wedding venue. Defendant complained condominium residents were harassed and blocked from use and access of the roadway.

For specific reasons unclear from the record, the Borough's attorney sent plaintiff a letter dated May 8, 2023 regarding "Fire Lanes," referencing both the

Palisadium Drive at the time. Before the trial court, plaintiff disputed the Borough's action resulted from an agreement between the parties.

1973 and 1989 agreements pertaining to Palisadium Drive. The letter stated, "Although [Palisadium Drive] is owned by your company, the Borough paves, salts, and maintains the roadway to assist all residents and business invitees to the Palisadium and Carlyle. Additionally, the easement grants [defendant]'s residents and visitors access over your property." The letter then instructed, "you must cease and desist from precluding Carlyle residents access to the roadway . . . or hampering Borough Officials in addressing fire safety needs and Fire Lane Markups."

B.

1. Complaint and Motions for Summary Judgment

In March 2023, plaintiff filed a complaint in the Law Division related to the parties' ongoing dispute over Palisadium Drive. Count one sought termination of the prior easement agreements, and count two an injunction to prevent defendant's residents from using Palisadium Drive. Count three alleged defendant breached the covenants of good faith and fair dealing by exceeding lawful access beyond that permitted by the 1989 agreement; and count four alleged breach of contract for defendant's failure to secure insurance for Palisadium Drive as required by the 1989 agreement.

9

Defendant filed an answer and counterclaim asserting six counts: count one sought specific performance for "breach of easement in a loading zone"; count two alleged a breach of the covenant of good faith and fair dealing based on plaintiff's "alleged harassment"; count three alleged nuisance based on plaintiff's "continual harassment" of Carlyle residents; count four alleged a deprivation of property rights; count five alleged tortious interference, also based on plaintiff's harassment; and count six sought declaratory judgment that the 1973 agreement controlled the easement property.

At the close of discovery, both parties moved for summary judgment. The record before the motion court included the 1973 and 1989 agreements, the 2023 letter from the Borough, and deposition excerpts from Shella Abadi, plaintiff's representative, and Sandra Morse, defendant's property manager. At deposition, Abadi explained her husband and other family members have owned the LLC that holds the Palisadium property since 2005, and began management of the property and the wedding venue located on it in 2007. She indicated the venue is under new management, but she continues to address "building issues" concerning the property. She described Palisadium Drive as a private roadway, but denied blocking pedestrian use of Palisadium Drive by residents of Carlyle Towers, adding that she only objected to pedestrians walking their dogs. She

10

expressed her concern is for the wedding venue where food is served, describing venue staff is required to spend hours cleaning up dog feces on plaintiff's property. She refused to speak about a specific encounter with a Carlyle resident.

Morse testified she worked for defendant for twelve years, holding the position of property manager for three. She understood Carlyle Towers residents had the right to use Palisadium Drive for "vehicular and pedestrian traffic," but could not identify the source of that right. When shown pictures of vehicles and pedestrians walking dogs of Palisadium Drive, Morse testified some were Carlyle residents, but she could not identify others with certainty. She also indicated she was unaware whether defendant insured or maintained Palisadium Drive pursuant to the 1989 agreement.

At oral argument, the court initially inquired whether ownership of Palisadium Drive was disputed. Defendant responded by questioning plaintiff's ownership, citing the Borough's maintenance of the roadway. Plaintiff argued it owned the roadway, citing the 1989 agreement acknowledging its ownership, and alleging it could only grant an easement as it had if it owned the property. Plaintiff asserted the establishment of fire lanes and loading zones did not "negate[] ownership," likening Palisadium Drive to "any commercial parking

11

lot" for which the Borough has the right to establish fire lanes and loading zones. Plaintiff also averred the Borough occasionally maintains Palisadium Drive, but plaintiff also maintains the property by, for example, shoveling snow.

The court stated, "I'm not sure whether ownership is necessarily a dispositive issue right now. We're talking about easements." The court then instructed the parties to begin oral argument concerning the access dispute.

Plaintiff clarified it was seeking an order declaring the 1989 agreement controls Palisadium Drive and restricts defendant's use "solely to access for vehicular traffic over the service access way to the service entrance located in [Carlyle Towers]." Additionally, plaintiff requested a declaration that defendant's use of the easement property is conditioned upon "[defendant's] provision of adequate insurance."

Plaintiff claimed the 1989 agreement, rather than the 1973 agreement, controlled defendant's access to Palisadium Drive because the second easement was executed around the time Carlyle Towers was completed, and plaintiff would not have allowed pedestrian traffic at and around its wedding venue entrance. Plaintiff disputed defendant's reliance on the 1973 agreement, arguing

12

that easement permitted pedestrian traffic for "maintenance and construction of tennis courts," "long ago" completed.[3]

Plaintiff emphasized the 1989 agreement's language expressly restricted access to use "[s]olely for vehicular ingress and egress" and "solely for vehicular access." Thus, plaintiff argued defendant violated the 1989 agreement by overburdening the roadway, allowing its residents to walk on and through Palisadium Drive and their dogs to defecate by the wedding venue, and failing to procure insurance listing plaintiff as "co-insured."

Defendant conceded it would provide insurance, although emphasizing plaintiff never requested defendant secure insurance until filing its complaint.

---

[3] Paragraph five of the 1973 agreement contained a separate paragraph referencing the construction of tennis courts, stating in relevant part:

> Anything herein or elsewhere to the contrary notwithstanding there is hereby granted the right to the owner of the Palisadium, to erect one or more but not more than three tennis courts on the land of Towers 200 and/or any other portion of the Overall Tract . . . . At this writing Centex is the owner of the Palisadium. In the event that the ownership of the same shall change prior to the erection of all three tennis courts on the Overall Tract, then the owner of the Palisadium is precluded from exercising any of the rights granted in the within paragraph without the prior written consent of Centex, and any act in derogation hereof shall be null and void.

Defendant then argued the 1989 agreement does not supersede, and is not inconsistent with, the 1973 agreement. It contended the 1973 agreement is the only document that controls access because there is no indication regarding who entered into the 1989 agreement, which was never ultimately recorded in defendant's master deed.

Defendant further argued it has "no control over who uses that street" because, for decades, Carlyle residents and pedestrians from other buildings have used Palisadium Drive, in particular to access the gym on plaintiff's property prior to its replacement with a wedding venue. According to defendant, there came a point when plaintiff began obstructing access, stopping and interfering with those using the roadways. Defendant also indicated plaintiff fails to utilize the parking garage and instead parks vehicles in the fire lanes during events.

2. The Court's Decision

The court then stated its findings. It first framed the access issue, stating, "[Plaintiff] maintains that [Palisadium Drive] is not a public property . . . but instead is owned by [plaintiff]. [Defendant] maintains the roadway is a public road shared by both [plaintiff] and [defendant] . . . and that it is maintained by the [B]orough."

A-2894-24

After citing the summary judgment standard and applicable law, the court noted "there are some material facts in this matter not in dispute." The court found it undisputed that there were two easements "at issue" in this case: "the 1973 easement over the parcel and the 1989 easement providing, among other things, vehicular access over the service way." The court also found it "undisputed" that the Borough in 2014, "created a fire zone along the wall" by the Carlyle Towers entrance, and "a loading zone on the west side of the roadway from the point of the end of the gate from the parking garage of the Palisadium." The court also referenced the 2023 letter from the Borough, noting it lacked "force of law," but was "evidentiary in nature as to the understanding of the [B]orough regarding the relationship of the parties."

The court found defendant "has allowed its residents, invitees and vendors to use the area for pedestrian traffic, dog walking, parking and construction-related activities." Specifically, the court found Carlyle Towers residents use the back entrance to the North Tower building, often exiting from there to walk their dogs on Palisadium Drive. However, the court found questions of fact remained "regarding who is using the service walkway," rendering the court unable to "conclude that the use of the service area is solely by [defendant]."

15

The court noted, when the 1973 agreement was entered, new construction was underway on the Overall Tract, and "the intent was that the various parcels that would ultimately comprise the [Overall Tract] . . . would work together." The court concluded, "the 1973 easement was clear in that regard and permitted pedestrian and vehicular access in accordance with the 1973 easement." However, the court noted the master deed was not in the record, and thus found "the 1989 easement is not void. The parties have been operating consistent with the 1989 easement since the period of time that it was recorded or drafted, that over [thirty] years have passed since that time."

The court then reconciled the two agreements as not in conflict, interpreting the 1989 agreement as "not expressly extinguish[ing] any rights of ingress or egress or pedestrian access granted under the 1973 easement," but instead "also provid[ing] vehicular access to the Carlyle over the service way." As to plaintiff's argument that the 1989 agreement's language changes the permitted access and limits use "solely" to vehicle traffic, the court stated there was no process undertaken to "modify, abrogate, or alter the terms of the 1973 agreement, which the court f[ound] to be clear and unambiguous."

Further, the court noted "the 1989 easement was clarified in 2014 using the mediation efforts of the Borough, which ultimately resulted in the creation

16

of a loading and fire zone to the benefit of both [plaintiff] and [defendant]."  The court concluded:

> [T]he 1973 easement is valid, as is the 198[9] easement, and that the parties are required to abide by the terms of each, as well as the terms of the . . . 2014 mediation result, memorialized in the memorandum of July 10th, 2014 to [the] borough attorney . . . regarding fire lanes, roadway, Palisadium Drive[.]

The court added, the agreements "are not so different that [the] 1989 easement would necessarily supersede or extinguish the 1973 [easement]" and thus entered partial summary judgment in favor of defendant.

Regarding the parties' remaining arguments and claims, the court found questions of fact existed regarding the nature of "vehicular access and parking in the area," "pedestrian access," and "the insurance . . . arrangements in connection with the 1989 easement," specifically, "whether or not the insurance was insisted on by [plaintiff] or not historically; whether or not the insurance was procured; whether or not the insurance requirement is, in fact, waived given the amount of time this agreement has been in play."  It further found disputes concerning actions allegedly taken by plaintiff to obstruct or prevent use of the roadway and plaintiff's claims of defendant's misuse of the roadway impacting its wedding venue.  Accordingly, the court granted defendant partial summary

17

judgment on defendant's counterclaim for declaratory judgment, and denied summary judgment on the remaining claims.

On April 3, 2025, the court issued a consent order, noting the parties "agreed" to dismiss "[a]ll remaining claims, counterclaims, and defenses." Defendant reserved its "right to appeal with regard to reinstating its counterclaims" in the event plaintiff appealed. The order directed defendant provide to plaintiff "proof of current insurance coverage naming [plaintiff] as an additional insured in accordance with the 1989 [e]asement." Finally, the order provided for vacatur if either summary judgment order "is vacated or reversed on appeal."

## II.

Plaintiff appeals from both summary judgment orders. Plaintiff argues the court erred in denying its motion for summary judgment and partially granting defendant's because: (1) the court improperly construed the 1973 agreement too broadly, as its language limited easements to use necessary for construction and maintenance of the Overall Tract, and the court's interpretation renders other provisions in that easement and the 1989 agreement, superfluous; (2) alternatively, even assuming the 1973 agreement provided for residential pedestrian access, granting summary judgment at this juncture was improper

18

because a material conflict exists between the two easements creating genuine issues of material fact as to whether the 1989 agreement superseded the 1973 agreement; (3) the court improperly relied on the non-party Borough's past informal determinations of the respective rights, which are not binding or relevant to the court's decision; (4) the court erred in granting defendant declaratory judgment under the Declaratory Judgment Act, specifically because the court's granting declaratory judgment failed to "remove uncertainty as to the relationship between the [two easements]"; and (5) the court "failed to award [plaintiff] summary judgment" because defendant breached the insurance provision of the 1989 agreement by failing to obtain insurance naming plaintiff as "co-insured."

## A.

"We review de novo the trial court's order granting summary judgment and are guided by the same standards that governed its decision." Boyle v. Huff, 257 N.J. 468, 477 (2024). A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). "To decide whether a genuine issue of

material fact exists, the trial court must 'draw[] all legitimate inferences from the facts in favor of the non-moving party.'" Friedman v. Martinez, 242 N.J. 450, 472 (2020) (alteration in original) (quoting Globe Motor Co. v. Igdalev, 225 N.J. 469, 480 (2016)). "The court's function is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" Rios v. Meda Pharm., Inc., 247 N.J. 1, 13 (2021) (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995)). "In the absence of a factual dispute, we review the interpretation of a contract de novo." Serico v. Rothberg, 234 N.J. 168, 178 (2018).

B.

"An easement creates a non-possessory right to enter and use land in the possession of another and obligates the possessor not to interfere with the uses authorized by the easement." Caribbean House, Inc. v. N. Hudson Yacht Club, 434 N.J. Super. 220, 226 (App. Div. 2013). "An easement appurtenant is created when the owner of one parcel of property (the servient estate) gives rights regarding that property to the owner of an adjacent property (the dominant estate)." Rosen v. Keeler, 411 N.J. Super. 439, 450 (App. Div. 2010). Easements can be created by implication, express conveyance, or prescription. Leach v. Anderl, 218 N.J. Super. 18, 24 (App. Div. 1987). And, an easement

20

"cannot exist separate from the land itself." Vill. of Ridgewood v. Bolger Found., 104 N.J. 337, 340 (1986).

Easement agreements are analyzed under principles of contract interpretation. Borough of Princeton v. Bd. of Chosen Freeholders of the Cnty. of Mercer, 333 N.J. Super. 310, 324-25 (App. Div. 2000). Under such principles, "[c]ourts enforce contracts 'based on the intent of the parties, the express terms of the contract, surrounding circumstances and the underlying purpose of the contract.'" Manahawkin Convalescent v. O'Neill, 217 N.J. 99, 118 (2014) (quoting Caruso v. Ravenswood Devs., Inc., 337 N.J. Super. 499, 506 (App. Div. 2001)). We refrain from interpreting a provision in a way that "would render another provision meaningless." Homesite Ins. Co. v. Hindman, 413 N.J. Super. 41, 47 (App. Div. 2010).

To determine the extent of the rights conveyed under an easement, courts look to the intent of the conveyor, and, "the intent of the conveyor is normally determined by the language of the conveyance read as an entirety and in the light of the surrounding circumstances." Khalil v. Motwani, 376 N.J. Super. 496, 503 (App. Div. 2005) (quoting Hammett v. Rosensohn, 26 N.J. 415, 423 (1958)). When the terms of an easement are unambiguous and "the intent of the parties is evident," the "terms of the instrument govern." Rosen, 411 N.J. Super. at 451.

Applying these well-settled principles in view of the summary judgment record, we first address and reject plaintiff's argument that the court erred in denying plaintiff judgment based upon an incorrect and overly broad interpretation of the 1973 agreement's language. As the court correctly noted, Centex, as owner of the then-undeveloped Overall Tract, stated its purpose in issuing its "declaration of easements and operating agreement," before the numbered provisions that followed, "to create and establish certain easements, restrictions and obligations, binding upon and inuring to the benefit of owners and operators of the various portions of the Overall Tract . . . in order to provide for the full and efficient development and operation thereof."

Immediately following, in paragraph one, Centex clarified the "access easement" provides a right of use by "pedestrians and vehicles" over roadways on portions of the Overall Tract. The access provision unambiguously extends to "owners" "of every portion of the Overall Tract," and their "invitees, licensees, heirs, personal representatives, successors and assigns," the right "of ingress, egress, passage and use, for pedestrians and vehicles, over all interior roadways . . . constructed on portions of the Overall Tract." (Emphasis added). Palisadium Drive is a constructed roadway on the overall tract.

Although it is true that the 1973 agreement also creates by separate paragraph a "utility easement" that allows for the "construction" of utilities, the separately standing access easement contains no limiting reference to maintenance or construction. We do not interpret the utility provision allowing access to traffic by construction and maintenance personnel to negate or govern the separately granted easements for general pedestrian and vehicular access throughout the Overall Tract. Indeed, the "Declaration of Easements," plural, creates various rights of access. (Emphasis added). As such, we perceive no merit to plaintiff's contention the 1973 agreement pertained only to construction on the Overall Tract.

We are also not persuaded the motion court's interpretation of the access easement in paragraph one renders superfluous paragraph sixteen, which provides Centex the right as the owner to later "execute and deliver a further declaration binding the portions of the Overall Tract covered thereby granting to the general public the right of vehicle and/or pedestrian access" over roadways within the Overall Tract. The provision allowing Centex the future discretion to make access grants to "the general public" is separate and distinct from the provision extending access rights to "owners." Thus, we do not

construe paragraph sixteen as duplicative of the access easement provided to "owners" in paragraph one.

We also reject plaintiff's claim that the rights granted in the access easement do not apply to Carlyle Towers residents. In Khalil, we held, "In a given context, a listing of persons or things should not be precisely limited to those expressly mentioned but may also include, by implication, other persons or things similarly situated." 376 N.J. Super. at 506 (citing Reilly v. Ozzard, 33 N.J. 529, 539 (1960)). As to whether one is similarly situated, "[t]he issue is one of intention [and][t]he answer resides in the common sense of the situation." Ibid. (alterations in original) (quoting Reilly, 33 N.J. at 539). Here, the 1973 agreement was executed while the Overall Tract included condominium buildings. Therefore, in line with our decision in Khalil, we similarly determine that the 1973 agreement's grant to "owners" and their "invitees, licensees, heirs, personal representatives, successors and assigns" includes Carlyle Towers residents.

Beyond our aligned interpretation of the nature and scope of the 1973 agreement, our agreement with the trial court ends. Specifically, we are not persuaded the two easements, so clearly dissonant on their faces, can be

24

harmonized on the present record. Thus, we are unable to conclude the grant of partial summary judgment was proper.

Generally, a contract supersedes an "earlier contract and becomes the only agreement on the part of the parties on the subject matter" if the later contract "cover[s] the same subject matter and [is] made by the same parties, but contain[s] terms inconsistent with the former contract so that the two cannot stand together." Rosenberg v. D. Kaltman & Co., 28 N.J. Super. 459, 463-64 (Ch. Div. 1953); see also Corbin on Contracts § 71.1 (rev. ed. 2021) (stating that when analyzing two contracts, a court must look at "the two contracts together" and, "[i]nsofar as they are inconsistent, the later one prevails; the remainder of the first contract, if consistent with the second in substance and in purpose, can be enforced").

Here, the 1973 access easement allowed for pedestrian traffic over all roadways within the Overall Tract. The 1989 agreement, pertaining only to Palisadium Drive and "solely" permitting vehicular traffic, does not. We cannot agree with the motion court's finding the 1989 easement merely "also provides vehicular access" over Palisadium Drive in addition to pedestrian access. (Emphasis added). "Solely" is not an ambiguous term; it is not susceptible to more than one reasonable interpretation. See Powell v. Alemaz, Inc., 335 N.J.

Super. 33, 44 (App. Div. 2000). Instead "solely" means "to the exclusion of all else" or "without another." Merriam-Webster's Collegiate Dictionary 1503 (12th ed. 2025). Therefore, on its face, the 1989 agreement's language defining its scope as "solely for the purpose of permitting access to vehicular traffic" grants a right to vehicular traffic "to the exclusion of" other forms of traffic. To read the 1989 agreement as merely reiterating vehicles are permitted to utilize Palisadium Drive, along with pedestrian traffic, would render the 1989 agreement "meaningless." See Homesite Ins. Co., 413 N.J. Super. at 47.

We are satisfied the 1973 access easement agreement and the 1989 easement agreement conflict to a degree "the two cannot stand together." See Rosenberg, 28 N.J. Super. at 463. The trial court erroneously reconciled the two agreements, without vital information concerning the intent underlying the 1989 agreement. Accordingly, we are constrained to vacate the order granting partial summary judgment in favor of defendants and remand for further proceedings.

Specifically, remand is required to determine the intent and circumstances surrounding the 1989 agreement, the parties to it, and the genesis of it, and whether those circumstances evidence an intent to limit defendant's residents' pedestrian access to Palisadium Drive. Given the conflict between the two provisions, inquiry beyond the 1989 easement's language to glean the parties'

26

intent is proper, as intent is derived from the language of the conveyance in light of surrounding circumstances.  See Khalil, 376 N.J. Super. at 503 (quoting Hammett, 26 N.J. at 423).

Additionally, on remand the court should determine the owner of Palisadium Drive at the time of the 1989 agreement.  Critically, only an owner of property can grant an easement over it.  Ownership is anything but immaterial, and the parties disputed ownership of the roadway.  Further, consideration should be given to the modification language in the 1973 agreement, requiring the consent of the owners of the "various portions of the Overall Tract" as it pertains to the validity of the 1989 agreement.  We do not suggest the outcome of these issues.

Given our determination, we also affirm the court's order denying plaintiff's motion for summary judgment, and, accordingly, vacate the April 3, 2025 consent order, as required under its own terms.

Affirmed in part, vacated and remanded in part.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M. C. Hanley

Clerk of the Appellate Division

27